Marlene ALEJANDRE, individually and as personal representative of the Estate of Armando Alejandre, deceased, Plaintiff,

v.

The REPUBLIC OF CUBA and the Cuban Air Force, Defendants,

v.

AT & T Corporation, AT & T of Puerto Rico, Inc., Global One Communications, L.L.C., Sprint Corporation, Wiltel, Inc., Telefonica Larga Distancia De Puerto Rico, Inc., MCI International, Inc., IDB Worldcom Services, Inc., MCI Worldcom, Inc., Citigroup Inc. and its Subsidiaries, and the Chase Manhattan Corporation and its Subsidiaries, Garnishees.

Mirta Mendez, as personal representative of the Estate of Carlos Alberto Costa, deceased, Plaintiff,

v.

The Republic of Cuba and the Cuban Air Force, Defendants,

v.

AT & T Corporation, AT & T of Puerto Rico, Inc., Global One Communications, L.L.C., Sprint Corporation, Wiltel, Inc., Telefonica Larga Distancia De Puerto Rico, Inc., MCI International, Inc., IDB Worldcom Services, Inc., MCI Worldcom, Inc., Citigroup Inc. and its Subsidiaries, and the Chase Manhattan Corporation and its Subsidiaries, Garnishees.

Mario T. De La Pena and Miriam De La Pena, individually and as personal representatives of the Estate of Mario M. De La Pena, deceased, Plaintiff,

v.

The Republic of Cuba and the Cuban Air Force, Defendants,

v.

AT & T Corporation, AT & T of Puerto Rico, Inc., Global One Communications, L.L.C., Sprint Corporation, Wiltel, Inc., Telefonica Larga Distancia

**1318**

De Puerto Rico, Inc., MCI International, Inc., IDB Worldcom Services, Inc., MCI Worldcom, Inc., Citigroup Inc. and its Subsidiaries, and the Chase Manhattan Corporation and its Subsidiaries, Garnishees.

Nos. 96–10126–CIV through 96–10128–CIV.

United States District Court, S.D. Florida.

March 18, 1999.

Aaron Podhurst, Miami, FL, Roberto Martinez, Miami, FL, Francisco Angones, Miami, FL, for plaintiff.

Donald Hayden, Miami, FL, Eric Lieberman, New York City, David George, Boca Raton, FL, Thomas Meeks, Miami, FL, Carol Federighi, Dept. of Justice, Civil Division, Washington, D.C., for defendant.

## OMNIBUS ORDER

KING, District Judge.

THIS CAUSE comes before the Court on the following motions: Plaintiff's Motion To Enforce Writ Of Execution, filed January 15, 1999; Plaintiffs' Motion For Second Writ Of Garnishment After Judgment, filed January 25, 1999; Carriers' (Garnishees') Joint Motion To Dissolve Writs Of Garnishment And To Quash Service, filed February 4, 1999; and Non-Party Empresa De Telecomunicaciones De Cuba, S.A.'s Motion To Dissolve Writs Of Garnishment, filed February 8, 1999. The Court heard Oral Argument on these Motions on February 16, 1999, and ordered the Parties to submit supplemental memoranda and exhibits by February 26, 1999.

## I. Factual and Legal Background

### A. *Murderous Act of Terrorism by Cuba Against United States Citizens*

On February 24, 1996, the Government of Cuba murdered four civilians flying on a routine humanitarian mission to rescue rafters in the Florida straits. As the four Brothers to the Rescue workers flew their two, unarmed airplanes in broad daylight over international waters, the Cuban Air Force—without provocation or warning—attacked them twice with sophisticated air-to-air MiG missiles. These missiles destroyed the Brothers to the Rescue planes, and killed the occupants instantly. After significant search and rescue efforts, the Coast Guard was unable to locate the remains of the four individuals who were aboard the airplanes.

In a statement delivered two days after the February 26, 1996, President Bill Clinton strongly condemned the actions by Cuba and its air force. He posited that the complete lack of justification for Cuba's murderous attack rendered the act a violation of international law. President Clinton stated the following:

> These small airplanes were unarmed and clearly so. Cuban authorities knew that. The planes posed no credible threat to Cuba's security. Although the group that operated the planes had entered Cuban airspace in the past on other flights, this is no excuse for the attack, and provides—let me emphasize—no legal basis under international law for the attack. We must be clear: This shooting of civilian aircraft out of the air was a flagrant violation of international law. It is wrong and the United States will not tolerate it.

Speech of Pres. Clinton, Feb. 26, 1996. Congress echoed the President's senti-

ment, explicitly finding with respect to the attack on the Brothers to the Rescue airplanes that "[t]he response chosen by Fidel Castro, the use of lethal force, was completely inappropriate to the situation presented to the Cuban Government, making such actions a blatant and barbaric violation of international law and tantamount to cold-blooded murder." *See* Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 22 U.S.C. § 6046(a)(10) (West 1998). The Legislative branch therefore joined the Executive branch in condemning Cuba's terrorist attack on the Brothers to the Rescue airplanes and the resultant murder of four individuals peacefully carrying out a humanitarian mission. *See id.* at § 6046(b)(1).

### B. Statutory Exceptions to Immunity for Terrorist Foreign States

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"). As part of the AEDPA, Congress amended the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602–11, to provide an additional exception to the general rule that federal courts lack subject matter jurisdiction over a claim brought against a foreign state. The AEDPA added section 1605(a)(7) to the FSIA in order to provide that a foreign state shall not be immune from the jurisdiction of federal courts in any case

in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for

such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency. . . .

Pub.L. No. 104–132, § 221, 110 Stat. 1214. (codified at 28 U.S.C. § 1605(a)(7)). If a claimant can demonstrate (1) that the foreign state was designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 or section 620A of the Foreign Assistance Act of 1961, and (2) that the claimant was a United States national at the time the terrorist act occurred, foreign state jurisdictional immunity is waived and a federal court has subject matter jurisdiction to hear the claim.

As part of the AEDPA, Congress also amended section 1610 of the FSIA, which covers the immunity of a foreign state[1] from attachment or execution.[2] In doing so, Congress added the following:

The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if . . . . the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

Pub.L. No. 104–132, § 221, 110 Stat. 1214. (codified at 28 U.S.C. § 1610(a)(7)). The AEDPA also provided that the property of an agency or instrumentality of a foreign state[3] shall not be immune from attach-

---

1. For purposes of the FSIA, a "foreign state" includes any political subdivision thereof, as defined in 28 U.S.C. § 1603(b) [defining "agency or instrumentality of a foreign state," see footnote 3]. *See* 28 U.S.C. § 1603(a) (West 1998).

2. The legislative history of the FSIA states that "[t]he term 'attachment in aid of execution' is intended to include attachments, gar-

nishments and supplemental proceedings available under applicable Federal or State law to obtain satisfaction of a judgment." H.R. No. 94–1487, *citing* Fed.R.Civ.P. 69.

3. The FSIA defines an "agency or instrumentality of a foreign state" as an entity

(1) which is a separate legal person, corporate or otherwise, and

ment or execution if the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of sections 1605(a)(2), (3), (5), or (7) or 1605(b). *See* 28 U.S.C. § 1610(b)(2). By amending section 1610, Congress assured not only that federal courts may exercise jurisdiction over claims brought by a United States national against a foreign state for a terrorist attack, but also that federal courts may enforce any judgment against the foreign state (and/or agency or instrumentality thereof) through attachment or execution. Congress specifically provided that its AEDPA amendments to the FSIA "shall apply to any cause of action arising before, on, or after the date of the enactment of this Act." Pub.L. 104–132, § 221(c), 110 Stat. 1214.

■ On September 30, 1996, Congress enacted the Omnibus Consolidated Appropriations Act of 1997. *See* Pub.L. No. 104–208, § 589, 110 Stat. 3009. As part of this Act, Congress added a statutory note—entitled "Civil Liability for Acts of State Sponsored Terrorism"—to 28 U.S.C. § 1605, which provides the following:

(a) An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 ... while acting within the scope of his or her office, employment shall be liable to the United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code ... for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7)....

28 U.S.C. § 1605 note (West 1998). By creating a cause of action against the agents of a foreign state that has lost its immunity by virtue of 28 U.S.C. § 1605(a)(7), the statutory note provides a mechanism through which the victim of a terrorist attack may collect compensatory and punitive damages. Since a foreign state would be liable for the tortious acts of its officials, employees and agents under the theory of *respondeat superior,* the victim of a terrorist attack may seek monetary damages from the foreign state itself, and/or from an agency or instrumentality thereof. *See Skeen v. Federative Republic of Brazil,* 566 F.Supp. 1414, 1417 (D.D.C. 1983) (characterizing section 1605(a)(5) as "a *respondeat superior* statute, providing an employer (the foreign state) with liability for certain tortious acts of its employees.").

C. *Lawsuit by Families of Victims of Cuban Terrorist Attack*

On October 31, 1998,[4] the personal representatives of three of the four victims[5] in the shoot down of the two Brothers to the Rescue airplanes instituted this action against the Republic of Cuba ("Cuba") and the Cuban Air Force ("CAF") to recover compensatory[6] and punitive damages pur-

---

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (West 1998).

4. Plaintiffs' lawsuit was brought two-and-a-half years after the date of the terrorist attack, well within the ten-year statute of limitations for such an action. *See* 28 U.S.C. § 1605(a)(7)(f) (West 1998).

5. The personal representatives of the fourth victim, Pablo Morales, could not join Plaintiffs' lawsuit because he was not a United States national at the time he was killed, a prerequisite to maintenance of a section 1605(a)(7) action. *See* 28 U.S.C. § 1605(a)(7)(B)(ii) (West 1998).

6. President Clinton had ordered the Treasury Department to make humanitarian payments to the surviving relatives of the four victims, authorizing payment of $1.2 million from blocked Cuban assets in the amount of $300,-000 per victim. *See* Mem. From Pres. Clinton to Sec'y of Treas., Oct. 2, 1996.

suant to 28 U.S.C. § 1605(a)(7) and the statutory note thereto. This Court conducted a trial on Plaintiffs' cause of action on November 13, 14, and 20, 1997.

On December 17, 1997, this Court entered Final Judgment on behalf of Plaintiffs and against Defendants Cuba and CAF for total compensatory damages of $49,927,911 [representing $17,532,913 for Case No. 96–10126–Civ–King, $16,130,704 for Case No. 96–10127–Civ–King, and $16,-264,294 for Case No. 96–10128–Civ–King]. In addition, the Court entered Final Judgment on behalf of Plaintiffs and against only Defendant CAF for punitive damages in the sum of $137,000,000 [representing $45.9 million—one percent of the approximate total value of the CAF's MiG fleet— for each of the three aforementioned cases]. This Court concluded its Order with the following unambiguous statement: "The total compensatory and punitive damages herewith awarded to Plaintiffs are $187,627,911, for which execution may issue forthwith against the Defendants Cuba and the Cuban Air Force and against any of their assets wherever situated."

Upon being notified of the Court's Final Judgment, Cuba's Ministry of Foreign Relations ("Ministry") expressed its intention to reject this Court's mandate and thus not to compensate the three victims. In a letter dated May 11, 1998, the Ministry stated that "[t]he Republic of Cuba is a Sovereign State and no North American court has jurisdiction to judge it or its institutions, much less for the events occurred on February 24, 1996 in Cuban territorial waters...." Letter from Ministry to the Honorable Swiss Embassy, U.S.A. Interests Section, May 11, 1998.

D. *Execution of Judgments on behalf of Victims of Terrorist Attacks*

In 1998, Congress again amended section 1610 of the FSIA. Congress enacted section 117 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act for 1999 ("Appropriations Act"), which provides as follows:

(a) EXCEPTION TO IMMUNITY FROM ATTACHMENT OR EXECUTION. Section 1610 of title 28, United States Code, is amended by adding at the end the following new subsection:

(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C.App. 5(b)), section 620(a) of a Foreign Assistance Act of 1961 (ww U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality, of such state) claiming such property is not immune under section 1605(a)(7).

"(B) Subparagraph (A) shall not apply, if at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

"(2)(A) At the request of any party in whose favor a judgment has been issued-with respect to a claim for which the foreign state is not immune under section 1605(a)(7), the Secretary of the Treasury and the Secretary of State shall fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

"(B) In providing such assistance, the Secretaries—

"(i) may provide such information to the court under seal; and

"(ii) shall provide the information in a manner sufficient to allow the court to direct the United States Marshal's officer to promptly and effectively execute against the property."

(b) CONFORMING AMENDMENT.—Section 1606 of title 28, United States Code, is amended by inserting after "punitive damages" the following: "except any action under section 1605(a)(7) or 1610(f)".

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall apply to any claim for which a foreign state is not immune under section 1605(a)(7) of title 28, United States Code, arising before, on, or after the date of enactment of this Act.

(d) WAIVER—The President may waive the requirements of this section in the interest of national security.

Pub.L. No. 105–277, § 117, 112 Stat. 2681 (codified at 28 U.S.C. §§ 1610(f)(1)(A), (1)(B), (2)(A), (2)(B)). Absent a Presidential waiver, section 117 provides for the attachment or execution of certain property—including blocked assets—following a judicial determination of liability in a case in which a foreign state is not immune by virtue of 28 U.S.C. § 1605(a)(7).

President Clinton signed the Appropriations Act, which included section 117, into law on October 21, 1998. However, that same day he issued Presidential Determination 99–1, which invoked subsection (d) of section 117 to waive application of 28 U.S.C. §§ 1610(f)(1) and (f)(2) [the entirety of section 117] in the interest of national security.

The Parties dispute the power of the President under section 117(d) to waive 28 U.S.C. § 1610(f)(1), in light of the statutory language allowing the President only to waive "the requirements of [ ] section [117]." The Court will analyze the statutory waiver authority and the effect of the President's exercise thereof in Part III.A of this Order.

### E. *Blocking of Cuban Assets by the United States*

In 1962, seeking "to promote national and hemispheric security," President John F. Kennedy established a comprehensive embargo on trade with Cuba. *See* Pres. Proclamation No. 3447, 27 Fed.Reg. 1085 (1962), *reprinted in* 22 U.S.C. § 2370 note. On July 8, 1963, the Treasury Department's Office of Foreign Assets Control ("OFAC") promulgated the Cuban Assets Control Regulations ("CACR") to implement the embargo. Among other things, the CACR ordered that Cuban assets in the United States be blocked, pursuant to the Trading With the Enemy Act of 1917 ("TWEA"). *See* 50 U.S.C. §§ 1–44 (West 1998).[7] Unless licensed by the Treasury Department, the CACR prohibit any United States national from dealing in the blocked property of the Cuban government. *See* 31 C.F.R. § 515.201 (West 1998). Consequently, a party may not attach or execute blocked property on a judgment without a license to do so. *See* 31 C.F.R. § 515.203(e) (West 1998) ("Unless licensed or authorized . . . any attachment, judgment, decree, lien, execution, garnishment or other judicial process is null and void with respect to any property in which on or since the 'effective date' there existed the interest of a designated foreign county [including Cuba] or national thereof.").

As to the amount of blocked Cuban assets in the United States, a January 1998 Report by OFAC shows blocked Cuban assets to be valued at $178.2 million. *See*

---

7. According to the current Deputy Assistant Secretary for Energy, Sanctions, and Commodities of the Department of State, "[b]locking assets represents one of the primary tools at the disposal of the United States to combat terrorism and other conduct that threatens the security of the United States and its citizens, and to seek to modify such conduct." Decl. of Peter E. Bass, at ¶ 3.

1997 Annual Rep. to Cong. on Assets in the United States Belonging to Terrorist Countries or Int'l Terrorist Orgs.

E. *Telecommunications Services Between the United States and Cuba*

In 1992, Congress passed the Cuban Democracy Act ("CDA"), providing for the resumption of direct telecommunications service between the United States and Cuba. *See* 22 U.S.C. § 6004(e)(1) (West 1998). To realize this goal, the CDA authorizes payments to Cuba by license of amounts due "as a result of the provision of telecommunications services," but not from blocked accounts. *See* 22 U.S.C. § 6004(e)(3) (West 1998).

In July 1993, the Department of State and the Federal Communications Commission ("FCC") developed policy guidelines to implement the CDA. These guidelines authorize the Treasury Department to license U.S. telecommunications companies to remit to Cuba the full share of Cuba's earnings from the FCC-approved services. OFAC has amended the CACR to provide for specific licensing on a case-by-base basis for certain transactions related to telecommunications between the United States and Cuba, including the settlement of charges under their service agreements. *See* 31 C.F.R. § 515.542(c) (West 1998).

OFAC has issued eight telecommunications licenses since the enactment of the CDA, none of which permit payments to the government of Cuba from blocked accounts. The service agreements stemming from the licenses became operative in November 1994. Since then, licensing payments have been flowing from telecommunications companies in the United States to some Cuban entity. On October 8, 1998, President Clinton reported that the following payments were made by OFAC-licensed United States telecommunications carriers to "the Government of Cuba" for the period January 1 through June 30, 1998:(1) $12,795,658 by AT & T Corporation (formally, American

Telephone and Telegraph Company); (2) $292,229 by AT & T de Puerto Rico; (3) $3,075,733 by Global One (formerly, Sprint Incorporated); (4) $4,402,634 by IDB WorldCom Services, Inc. (formerly, IDB Communications, Inc.); (5) $8,468,-743 by MCI International, Inc. (formerly, MCI Communications Corporation); (6) $129,752 by Telefonica Larga Distancia de Puerto Rico, Inc.; (7) $4,983,368 by WilTel, Inc. (formerly, WilTel Underseas Cable, Inc.); and (8) $5,371,531 by WorldCom, Inc. (formerly, LDDS Communications, Inc.). *See* Message to Cong. Reporting on Payments to Cuba, *reprinted in* 144 Cong.Rec. S12,161-62 (Oct. 9, 1998) *and* 144 Cong.Rec. H10,343-44 (Oct. 9, 1998). In sum, U.S. telecommunications companies made $39,519,648 in payments to some Cuban entity. *See id.*

The Parties dispute the nature of the Cuban entity to which payments flowed from U.S. telecommunications companies. Specifically, the Parties disagree on whether or not payments were made to the Government of Cuba or some entity distinct/independent therefrom. The Court will examine the status of that entity—as well as the effect of that status on Plaintiffs' ability to attach or execute payments thereto in satisfaction of their judgment—in Part III.B of this Order.

## II. Post–Judgment Proceedings

### A. *Writs of Execution*

On October 23, 1998, Plaintiffs filed an Application for Order in Aid of Execution of Final Judgment, seeking this Court's authorization for the Clerk of the Court to issue a Writ of Execution on AT & T Corporation ("AT & T"). This Court granted Plaintiffs' Application, and the Clerk of the Court issued a Writ of Execution seizing any blocked assets of Defendants within AT & T's possession or control (except for property subject to section 208(f) of the Foreign Missions Act (22 U.S.C. § 4308(f)), as provided in section 117 of the Appropriations Act.)[8]

---

8. On November 5, 1998, the Clerk of the Court issued a similar Writ of Execution on

The Chase Manhattan Corporation and its subsidiaries.

AT & T responded to the Writ of Execution on November 19, 1998. AT & T stated that, although it had deposited funds into three accounts in which Cuba "has or may have an interest," those accounts were blocked pursuant to the CACR. *See* AT & T Resp., at ¶ 1, *citing* 31 C.F.R. § 515.201. In a footnote, AT & T argued that, although section 117 would allow for the attachment of certain blocked assets in cases where a foreign state has been adjudged liable for certain terrorist actions, the President's waiver of section 117 preserved the status quo prohibiting the attachment or execution of blocked assets. *See id.* at 3 n. 1. Accordingly, AT & T advised Plaintiffs to apply to OFAC for a license in order to obtain funds from the three accounts in which Cuba "has or may have an interest." *See id.* at ¶ 2, *citing* 31 C.F.R. § 515.203(3).

Plaintiffs' submitted a Motion To Enforce Writ Of Execution on January 15, 1999, to which AT & T responded on February 8, 1999. The Court will rule upon Plaintiff's Motion in this Order.

### B. *Writs of Garnishment*

■ On November 30, 1998, Plaintiffs filed a Motion For Garnishment [9] After Judgment, seeking a Writ of Garnishment' against AT & T and nine other entities. On December 9, 1998, this Court granted Plaintiffs' Motion, directing the Clerk of the Court to issue Writs of Garnishment against the following Garnishees: AT & T, AT & T of Puerto Rico, Inc. ("AT & T–PR"), Global One Communications, L.L.C. ("Global One"), IDB WorldCom Services, Inc. ("IDB"), MCI International, Inc. ("MCI–I"), Telefonica Larga Distancia de Puerto Rico, Inc. ("TLD–PR"), WilTel, Inc. ("WilTel"), WorldCom, Inc. ("World-Com"), Citigroup Inc. and its subsidiaries (collectively, "Citigroup"), and The Chase Manhattan Corporation and its subsidiaries (collectively, "Chase"). Pursuant to this Court's Order, Writs of Garnishment in the amount of $187,627,911 were issued on the ten garnishees on December 18, 1998.

Eight garnishees filed Answers to the Writs as follows: IDB, MCI–I, and WilTel on January 11, 1999 and amended on January 20, 1999; AT & T and AT & T–PR on January 11, 1999; TLD–PR on January 19, 1999; Chase on January 20, 1999; and MCI–WorldCom, Inc. ("MCI–W"), formerly WorldCom, on January 28, 1999.[10] In their Answers, Garnishees put forth the following main arguments [11] as to why any Cuban assets in their possession may not be attached or executed to satisfy the final judgment in favor of Plaintiffs:

(1) Plaintiffs failed to obtain licenses from OFAC pursuant to 31 C.F.R. §§ 515.203(e) and 515.542(c), which would be necessary to attach or execute blocked Cuban assets given the President's waiver of section 117;

(2) Garnishees do not have any tangible or intangible personal property of either Defendant in their possession or control because all payments made under their telecommunications service agreements are made to an entity separate and apart from the Government of Cuba;

(3) Garnishees' payments are made to and from Canadian bank accounts such that they are exempt from garnishment pursuant to, *inter alia*, 28 U.S.C.

---

**9.** Plaintiffs have a "right to writ of garnishment 'to subject any debt due to defendant by a third person, and any tangible or intangible personal property of defendant in possession or control of a third person.' " *See Hattaway v. McMillian*, 859 F.Supp. 560, 563 (N.D.Fla. 1994), *quoting* Fla.Stat.Ann. § 77.01 (West 1998).

**10.** On January 25, 1999, Plaintiff moved for default as to Citigroup, for failure to Answer the Writ of Garnishment.

**11.** After hearing Oral Argument, the Court understands the Garnishees' objections to the Writs of Garnishment to be slightly more limited than the laundry list originally put forth by them in their Answers. The Garnishees' supplemental memoranda support this Court's understanding.

§ 1609, which limits garnishment to commercial assets located within the United States; and

(4) Plaintiffs' failure to serve the Writ of Garnishment by a federal marshal within the territorial limits of Florida amounts to a failure of service of process.

*See* Answers To Writ Of Garnishment. Plaintiffs' replied to the Answers of IDB, MCI–I, WilTel, AT & T, and AT & T–PR on February 1, 1999, and to the Answers of TLD–PR, Chase, and MCI–W on February 8, 1999. In their Replies, Plaintiffs summarily deny the Garnishees' substantive defenses, and affirmatively assert that any indebtedness in Garnishees' control is in fact owed to the Government of Cuba. *See* Pls.' Replies To Answers To Writ Of Garnishment.

In light of Garnishees' Answers, Plaintiffs' moved for a second Writ of Garnishment on January 25, 1999. Plaintiffs submitted a corrected list of the following eleven Garnishees: AT & T, AT & T–PR, Global One, Sprint Corporation ("Sprint"), WilTel, TLD–PR, MCI–I, IDB, MCI–W, Citigroup, and Chase. The Court will rule on Plaintiffs' Motion For Second Writ Of Garnishment in this Order.

### C. *Motions To Dissolve Writs Of Garnishment And To Quash Service*

In response to Plaintiffs' Writs, on February 4, 1999, seven of the Garnishees (namely, AT & T, AT & T–PR, TLD–PR, WilTel, IDB, MCI–I, and MCI–W) filed a Joint Motion To Dissolve Writs Of Garnishment And To Quash Service. Non-Party ETECSA filed a similar Motion To Dissolve Writs Of Garnishment on February 8, 1999. Both Motions To Dissolve supply further argument and supporting documentation for the defenses raised by

the Garnishees' in their Answers to the Writs of Garnishment. The Court will address the Garnishees' arguments in Part III of this Order, and deliver a ruling as to both Motions To Dissolve in Part IV of this Order.

### D. *Statements of Interest of the United States*

The United States ("Government") filed three Statements of Interest during the post-judgment proceedings.[12] On December 9, 1998, the Government submitted its first such Statement, regarding Plaintiffs' Writ of Execution served upon AT & T.[13] With respect to the Writs of Garnishment, the Government filed Supplemental Statements of Interest on January 27, 1999 and February 8, 1999. In all three Statements, the Department of Justice explains in great detail its support for Garnishees' first and second arguments (regarding the effect of the President's waiver of section 117 and the status of the entity receiving payments from U.S. telecommunications carriers). The Court has given the due consideration required by law to the Government's Statements in arriving at its legal conclusions. *See Jackson v. People's Republic of China,* 794 F.2d 1490, 1492 (11th Cir.1986).

### III. Conclusions of Law

#### A. *Effect of President's Waiver of Section 117*

The Parties dispute the effect of President Clinton's October 21, 1998 waiver of section 117. Plaintiffs contend that the President did not have the statutory authority to waive the new 28 U.S.C. § 1610(f)(1), which allows the attachment or execution of blocked assets to satisfy a judgment in favor of the victims of a terrorist attack by a foreign state. The Gar-

---

**12.** Under federal law, the United States may appear in any federal court "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517 (West 1998).

**13.** Plaintiffs responded to this Statement on January 15, 1999, and also moved to define and limit the interest of the United States for purposes of future post-judgment proceedings. On January 27 and February 8, 1999, the United States filed a reply to Plaintiffs' Response and Motion; Garnishee AT & T did the same on February 8, 1999.

nishees, ETECSA, and the Government argue that the President's intended waiver of the entirety of section 117 was fully consistent with the authority vested by Congress in section 117(d). This Court's interpretation of the statutory waiver authority, and the effect of the President's exercise thereof, determines whether Plaintiffs' Writs of Garnishment may issue: if President Clinton could and did waive the new 28 U.S.C. § 1610(f)(1), the Garnishees' Cuban assets would remain blocked accounts exempt from attachment or execution under the CRAC.

The Court will look to the following in interpreting the waiver authority in section 117(d): (1) its plain meaning; (2) the legislative history surrounding its passage; (3) its constitutionality; (4) its effect on United States' treaty obligations; (5) its effect on the President's authority over foreign policy; and (6)its construction in light of the deference afforded to administration by the Executive branch.

### 1. *Plain Meaning of Section 117(d)*

As the Supreme Court has observed, the starting point in construing a statute is looking at the statute's plain meaning. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). If the statute's language is unambiguous, and the legislative scheme is coherent and consistent, the court's statutory interpretation ends. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Plaintiffs read the language of section 117(d), which empowers the President to waive "the requirements of this section," to authorize only the waiver of the new 28 U.S.C. § 1610(f)(2), and not the waiver of the new 28 U.S.C. § 1610(f)(1). Plaintiffs reason that, insofar as it obligates the Secretary of the Treasury and the Secretary of State to "fully, promptly, and effectively assist any judgment creditor . . . in identifying, locating and executing against

the property" subject to execution or attachment in aid of execution, subsection (f)(2) imposes a "requirement," which they understand to mean "an imperative necessitating either action or forbearance." *See* Pls.' Proposed Findings of Fact, at Part I, ¶ 6. On the other hand, Plaintiffs construe subsection (f)(1) as not mandating any action or inaction since the word "shall," which alone might imply a mandatory condition, is followed by the more conditional "be subject to." *See id.* Plaintiffs believe that subsection (f)(1)'s proviso that certain property "shall be subject to" attachment or execution is a "self-executing provision" and not a "requirement." *See id.* at ¶ 7. Plaintiffs therefore aver that the President did not have the statutory authority to waive subsection (f)(1).

The Government reads the plain language of section 117(d) differently from Plaintiffs.[14] Citing a Supreme Court finding that the word "shall" generally connotes an obligation that a federal court is without discretion to ignore, the Government argues that subsection (f)(1) unambiguously imposes a "requirement" that the property at issue be attached or executed. *See* Stmt. of Int., at 11, *citing Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 962, 140 L.Ed.2d 62 (1998). The Government further challenges Plaintiffs' characterization using the yardstick of common sense. *See id.* at 11–12. Although the Government's understanding of the term "requirement" may comport better with common understanding, the use of the word in the context of the statutory scheme set out is far from clear.

Plaintiffs counter the Government's characterization of the plain meaning by recommending that this. Court look to the statute as a whole (meaning the entirety of section 117, and perhaps even including the AEDPA and the FSIA) rather than only the single word "shall" in order

---

**14.** The Garnishees have adopted the arguments of the United States regarding the effect of the President's waiver of section 117.

*See* Garnishees' Mot. To Dissolve Writs Of Garnishment And To Quash Service, at 9.

to give proper effect to its object and purpose. *See* Pls.' Proposed Findings of Fact, at Part I, ¶ 6, *citing Webster v. Reproductive Health Servs., Inc.,* 492 U.S. 490, 514, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). Presumably, Plaintiffs believe that the obvious Congressional intent to subject the property at issue to attachment or execution fundamentally contradicts the notion of granting the President the power to waive that legislative determination. Plaintiffs also urge the Court to give meaning to every word in the statute's text so as to recognize that the Government's reading inappropriately renders the phrase "the requirements of" superfluous. *See id.* at ¶ 8, *citing Ratzlaf v. United States,* 510 U.S. 135, 140–41, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in [old Supreme Court cases], it was said that 'a statute ought, upon the whole, to be construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant.' ") (citations omitted). In other words, had Congress intended to give the President the waiver authority proffered by the United States, it would have drafted section 117(d) without the words "the requirements of."

The Court finds that each of these recognized doctrines of statutory interpretation applies in reading section 117. However, they are not sufficient to require that the Court accept Plaintiffs' interpretation as the plain meaning of section 117(d). Particularly in light of Non–Party ETECSA's observation that statutory grants of presidential waiver in other contexts consistently specify the section or subsection that may be waived,[15] they do confirm that Congress' grant of the power to waive "the requirements of this section" is ambiguous. Given this determination, the Court will look to the legislative history surrounding the passage of section 117 in order to understand its meaning.

### 2. *Legislative History of Section 117(d)*

Generally, the most authoritative source federal courts turn to in unraveling a particular law's legislative history is the Conference Report on the bill. *See Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). In this particular case, the Conference Report is of no assistance in determining the meaning of section 117(d). The conferees explain the section using the same ambiguous language; they offer no guidance because they define the phrase using the phrase itself. *See* Conf.Rep., *reprinted in* 144 Cong.Rec. H11,044, H11,513 (Oct. 19, 1998) ("The conferees have included additional language giving the President the authority to waive *the requirements of this provision* in the interest of national security.") (emphasis added). Because the Conference Report does not aid in interpreting section 117(d), the Court will look to statements made by individual legislators with reference to the section during Congressional debate of the Appropriations Act.

■ A federal court examining legislative history through the words of those individuals making it is must do so cautiously. The Government argues that this Court should not consider the statements of individual legislators made during the course of the enactment process. *See* Stmt. of Int., at 14, *citing West Va. Univ. Hosps. v. Casey,* 499 U.S. 83, 98–99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), *In Re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988). This Court finds the authority cited by the Government to be inapplicable in this case. In *West Va. Univ. Hosps.,* the Supreme Court prohibited consideration of such statements only where the statutory language is unambiguous, which the Court

---

**15.** *See* ETECSA's Mem. In Support of Mot. To Dissolve Writs of Garnishment, at 27 n. 14, *citing* 50 U.S.C. §§ 98(e)(d)(1), 402(c)(3); 49 U.S.C. § 44908b, 42 U.S.C. § 6393a(2A), 22 U.S.C. §§ 1928, 2295(d)(2), 2796, 2797(e)(1), 5605(d); 10 U.S.C. § 7309(b); and 8 U.S.C. § 1102(b).

has already determined is not the case here. *See* 499 U.S. at 98–99, 111 S.Ct. 1138. In *Kelly,* the Ninth Circuit discouraged looking to the comments of individual legislators in relation to its argument that official committee reports provide the authoritative expression of legislative intent. *See* 841 F.2d at 912 n. 3. In this case, the Court has determined the Conference Report to be inconclusive. As such, the Court finds that it may look to the remarks of individual legislators made in reference to section 117(d).

The Court will look particularly to the intention of section 117's drafters, as evidenced by their remarks, in order not to produce a result demonstrably at odds with those intentions. *See Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), *In re Hoggle,* 12 F.3d 1008, 1010 (11th Cir.1994). In giving the drafters' remarks due deference, the Court will be careful not to give them "controlling" weight. *See Weinberger v. Rossi,* 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982).

On the day before President Clinton signed the Appropriations Act into law, a colloquy among four Senators was reprinted in the Congressional Record. *See* 144 Cong.Rec. S12,696, 12,705–06 (Oct. 20, 1998). In that colloquy, Senators Mack and Graham note that subsection (d) had been added to section 117 in conference after the bill had been passed by the Senate. *See id.* Senator Graham expressed his understanding that the statutory language "does not allow the President to waive the section as a whole, but only those parts that relate to 'requirements' on the Secretaries of Treasury and State." *Id.* Having attended the conference on section 117, Senator Faircloth noted that the Report of the Conference Managers clearly distinguished between the term "provision" and the phrase "requirements of this provision." *See id.* Affirming and clarifying Senator Graham's understanding, Senator Faircloth therefore stated that the only "requirements" in section 117 were in the new subsection (f)(2). *See id.* Finally, Senator Lautenberg—the drafter of the original section 117—opined against broad construction of the statutory waiver authority, ultimately ratifying Senator Faircloth's interpretation. *See id.* It appears from this colloquy that the Senators actively involved in the drafting of section 117 understood the statutory waiver authority to be limited to subsection (f)(2). Plaintiffs argue that this Court should give effect to these Senators' intentions and conclude that the President did not have the authority to waive subsection (f)(1).

The Government points out, however, that two Congressmen who spoke about section 117(d) after the conferees' addition thereof expressed their belief that the waiver provision would allow the President to waive the entirety of section 117, both the new subsection (f)(1) and (f)(2). *See* Stmt. of Int., at 14–15, *citing* 144 Cong. Rec. H11,592,11,647 (Oct. 20, 1998) (statements of Reps. Hoyer and Kolbe). Given this apparent disagreement between these commentators in the House and their counterparts in the Senate, the Court finds that the remarks of individual legislators prior to passage of the Appropriations Act do not sufficiently elucidate the inconclusive intent expressed in the Conference Report.

 The Court next looks at certain post-passage remarks regarding the nature and effect of section 117(d). The Court again proceeds cautiously, given the Supreme Court's admonition that "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage." *Blanchette v. Connecticut Gen. Ins. Corps.,* 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Because the Court finds the pre-passage legislative remarks to be inconsistent, it looks to post-passage remarks for aid in determining the legislature's intent in passing section 117(d).

On November 12, 1998, several Representatives in Congress voiced their opposition to the opinions proffered by Representatives Hoyer and Kolbe. First,

Representative Meek—one of the conferees on the Appropriations Act—joined the understanding expressed by Senators Graham, Lautenberg, and Faircloth prior to section 117's enactment. *See* 144. Cong.Rec. E2314 (Nov. 12, 1998). In advocating the narrow interpretation of the statutory waiver authority, Representative Meek noted that "[a]ny other interpretation would allow the President to, in effect, nullify this provision as if vetoing it, and thereby eliminate the important antiterrorism statement which Congress made by enacting the provision." *Id.* In addition, five members of the House Appropriations Subcommittee on Treasury, Postal Service and General Government—Representatives Forbes, Wolf, Istook, Northrup, and Aderholt—submitted the following:

> The intent of this waiver was to allow the President, only in limited circumstances, to waive the requirement that the Secretary of State and Secretary of the Treasury, under Subsection (f)(2)(A), cooperate with victims in locating terrorist assets. It was never intended to allow the President to waive Subsection (f)(1)(A), the change in the law which allows victims to attach such assets they are able to find on their own.... It is clear to us that, at no time, did Congress intend to give the President the absolute veto power he would have over the application of Section 117 should his expansive interpretation hold.

*Id.* These Representatives specifically addressed any federal court faced with Plaintiffs seeking to attach or execute the blocked assets of a terrorist state, beseeching the court not to mistake the legislative intent as authorizing a waiver of the entirety of section 117. *See id.* The Court notes that neither the Government, the Garnishees, nor ETECSA offer the Court evidence of any post-passage remarks confirming the broader interpretation of section 117(d) they seek to have this Court adopt.

Ultimately, the Court is left in a difficult position in interpreting the waiver authority given the President in section 117(d).

The statute's meaning is not plain; its ambiguity forced this Court to consider the legislative history surrounding its passage. That legislative history is surprisingly limited, especially in light of the significance with which the Executive branch now is imbuing the section. Irrespective of this lack of commentary by the Legislative branch, this Court must accept its role as interpreter of the law and give effect to section 117(d). In executing its constitutional role in this case, the Court is fully aware that the Plaintiffs on one side, and the Government, the Garnishees, and ETECSA on the other, both may find support for their respective point of view regarding the statutory waiver authority.

■ The Court concludes that, contrary to the President's intention in executing the waiver, Congress did not intend to give the President the broad authority to waive the new subsection (f)(1) when it gave him the power to waive "the requirements of this section." In so ruling, the Court gives considerable weight to the fact that the larger part of the available legislative history supports this interpretation. Also persuasive is the fact that section 117 is the outgrowth of the 1996 AEDPA amendments to the FSIA. Congress therein expressly waived the jurisdictional immunity of terrorist foreign states, and also their immunity from attachment or execution. Congress later clarified the mechanism through which the victims of an attack by a terrorist foreign state may sue for compensatory and punitive damages. By enacting section 117, Congress expanded the property subject to attachment/execution, giving the victims a larger pool of assets from which to satisfy any judgment in their favor. All of these legislative enactments are guided by a single purpose: to provide an executable judicial remedy to the nationals of the United States attacked by a terrorist foreign state. Had Congress intended to give the President the authority single-handedly to impede achievement of this goal, it could have done so more clearly in section 117(d). Its failure unam-

biguously to do so favors a narrow reading, both in light of legislative history and the fact that Congress usually specifies the waiver authority it grants with greater clarity. The President cannot simply express his intention to execute a law a certain way if that action is not allowed by the legislative authority to which it is made pursuant.[16] If the Government, the Garnishees, Non–Party ETECSA, or any other individual or entity objects to this Court's interpretation of this unclear legislative mandate, it should turn to Congress and have that government branch clearly enunciate a broad waiver authority in an amended section 117(d). It is this Court's responsibility to interpret the law as written; only Congress can re-write the law.

### 3. *Constitutionality of Section 117*

In the statement he made after signing the Appropriations Act, President Clinton stated that, absent waiver thereof, the new subsection (f)(1) of 28 U.S.C. § 1610 would infringe on the his constitutional authority to receive "Ambassadors and other public Ministers." *See* Stmt. of Pres., Oct. 24, 1998, *reprinted in* 1998 WL 743759. Citing Article II, section 2 of the Constitution, the Government expresses that same concern to this Court. *See* Stmt. of Int., at 18–19. The Executive branch suggests that, because the new 28 U.S.C. § 1610(f)(1) potentially subjects certain diplomatic property to attachment or execution, construing section 117(d)'s waiver authority narrowly may impede the President's ability to initiate or maintain diplomatic relations with a terrorist foreign state.

■ The Government concedes that "there is no diplomatic property is at issue in this case." *See* Stmt. of Int., at 16 n. 13. Since Plaintiffs are not seeking to attach or execute any diplomatic or consular property of Cuba, the Government's concern that subsection (f)(1) *may* subject such property to attachment or execution in some future case, and that this *may* adversely affect the President's ability to receive Ambassadors and other public Ministers [17] can be of no consequence. In exercising judicial restraint and avoiding constitutional problems that are not at issue, the Court does not feel that it would be appropriate to hold that the President may waive the entirety of section 117 merely because the new 28 U.S.C. § 1610(f)(1), if used in a manner in which Plaintiffs are not attempting to use it, might be applied unconstitutionally. As such, the Court declines the Government's invitation to declare section 117 to have been waivable by the President due to Article II, section 2 of the Constitution.

### 4. *Effect of Section 117 on United States' Treaty Obligations*

In his statement on the Appropriations Act, President Clinton also stated that he

**16.** The Court notes with great concern that the very President who in 1996 decried this terrorist action by the Government of Cuba now sends the Department of Justice to argue before this Court that Cuba's blocked assets ought not be used to compensate the families of the U.S. nationals murdered by Cuba. The Executive branch's approach to this situation has been inconsistent at best. It now apparently believes that shielding a terrorist foreign state's assets are more important than compensating for the loss of American lives.

**17.** The Court notes that Article II, section 3 of the Constitution does not guarantee that the President will be able to initiate and maintain diplomatic relations with all states. For obvious reasons, it could not command as such. It is difficult to see how construing the statutory waiver authority narrowly would restrict the President's ability to "receive Ambassadors and other Public Ministers"—a terrorist foreign state may decide not to send ambassadors or public ministers to the United States as a result of an attachment or execution made under the new 28 U.S.C. § 1610(f)(1), but the President nevertheless would retain the power to receive such individuals. Although the Court declines to rule as to the constitutionality of its interpretation of the statutory waiver authority in light of Article II, section 3, it does express its doubt that subsection (f)(1) would make a significant difference in the President's ability to initiate and maintain relations with terrorist foreign states, especially given the necessary prior judicial determination of liability for an act of terrorism.

was exercising his waiver because "section 117 would place the United States in breach of its international treaty obligations." Stmt. of Pres., Oct. 24, 1998, *reprinted in* 1998 WL 743759. The Government submits that, by potentially subjecting diplomatic and consular assets (including embassy property) to attachment or execution, the new 28 U.S.C. § 1610(f)(1) would place the United States in violation of the Vienna Conventions on Diplomatic and Consular Relations. *See* Stmt. of Int., at 16–17, *citing* T.I.A.S. 7502, 23 U.S.T. 3227 (1961), T.I.A.S. 6820, 21 U.S.T. 77 (1967). In order to avoid conflicting with these treaty obligations, the Government argues that the President's waiver must be held to extend to the new 28 U.S.C. § 1610(f)(1).

■ As the Court found in Part III.A.3, no diplomatic property is at issue in this case. Merely because the statute under which Plaintiffs bring their cause of action may be read in a manner that violates the treaty obligations of the United States does not mean that this Court should construe the President's statutory waiver authority broadly and fail to give the new 28 U.S.C. § 1610(f)(1) the meaning plainly intended by Congress.[18] If and when victims of a terrorist attack by Cuba or any other foreign state win a judgment in their favor and then seek to attach or execute diplomatic property, a federal court may have to determine whether or not 28 U.S.C. § 1610(f)(1) conflicts with the United States' treaty obligations. This Court need not undertake that examination, and therefore declines from doing so. However, the Court does note that Congress expressly decided to put diplomatic property at risk of attachment or execution by passing section 117, stating very clearly that it applies "[n]otwithstanding ... section 208(f) of the Foreign Missions Act...." By opening the door to the Unit-

ed States' potential violation of its treaty obligations, Congress intentionally sent a the message to terrorist foreign states that U.S. victims of violations of international law will be compensated, even if it must be from diplomatic property. Whether or not such transgressions justify an execution that potentially breaches this nation's treaty obligations must be determined by a federal court faced with plaintiffs seeking to attach diplomatic property; this Court holds only that this potential does not require broadly construing the President's statutory waiver authority in this case.

### 5. *Effect of Section 117 on President's Authority over Foreign Policy*

The United States argues that, since Presidential authority in areas of foreign policy generally is broad, this Court must construe the statutory waiver authority in section 117 broadly as well. *See* Stmt. of Int., at 18, *citing United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936). The Government also suggests that this Court broadly construe section 117(d) given that Congress frequently grants the Executive branch broad discretion in the arena of foreign affairs. *See id., citing Curtiss–Wright,* 299 U.S. at 324, 57 S.Ct. 216; *Florsheim Shoe Co. v. United States,* 744 F.2d 787, 795 (Fed.Cir.1984).

■ Although this Court does not disagree with the Government's characterization of Executive authority in the arena of foreign affairs, it nevertheless declines to hold that section 117(d) authorized the President to waive the new section 28 U.S.C. § 1610(f)(1). This Court determined in Part III.A.2 that Congress's grant of the authority to waive "the requirements of this section" did not include the power to to waive the new subsection (f)(1). This Court concluded that the only

---

18. The Government does not dispute that the new 28 U.S.C. § 1610(f)(1) specifically states that its requirements apply notwithstanding section 208(f) of the Foreign Missions Act, which provides that "[a]ssets of or under the control of the Department of State, wherever situated, which are used by or held for the use of a foreign mission shall not be subject to attachment, execution, injunction, or similar process, whether intermediate or final." 22 U.S.C. § 4308(f)) (West 1998).

authority granted to the President by Congress was the power to waive only the new subsection (f)(2). Therefore, the he President may employ his broad discretion in foreign affairs to exercise only this narrow waiver.

### 6. Section 117 and Deference to Administration by the Executive Branch

■ The Government's final argument as to why section 117(d) must be construed to have given the President the power to waive the new subsection (f)(1) is that this Court should defer to the Executive's interpretation of an ambiguous statute. *See* Stmt. of Int., at 19, *citing Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Government reasons that, if administrative agencies are entitled to deference in their application of regulatory legislation, the President similarly must be accorded such deference in application of statutory grants of Executive authority. *See id., citing Conoco, Inc. v. U.S. Foreign–Trade Zones Bd.,* 18 F.3d 1581, 1585 n. 11 (Fed.Cir.1994).

The Court finds that the principle enunciated by the Supreme Court in *Chevron* does not apply to the case at hand. Only a tortured reading of that case—dealing with an administrative agency's construction of an ambiguous statute that Congress has mandated that it administer—would have it stand for the position the Government seeks the Court to adopt in this case, in which the Court has concluded that the legislative grant of waiver authority did not include the power to waive the new 28 U.S.C. § 1610(f)(1). The President's decision to exercise his waiver is given great deference by this Court; however, his interpretation of the breadth of that waiver cannot belie the legislative authority from which it stems. Accordingly, the Court declines to adopt the Government's argument that it apply *Chevron* in order to defer to the President's interpretation of section 117(d)'s waiver authority.

### B. Legal Status of Entity to which U.S. Telecommunications Carriers Make Payments

The Parties dispute whether the funds Plaintiffs seek to garnish represent payments made to the Government of Cuba or some Cuban entity distinct therefrom. Plaintiffs argue that the payments ought to be treated by this Court as made to the Government of Cuba and thus subject to attachment or execution in satisfaction of the final judgment entered by this Court on December 17, 1997. Alternatively, Plaintiffs suggest, if it finds that these payments are made to some other Cuban entity, as the Non–Party and Garnishees maintain, this Court treat that entity as a government instrumentality with a juridical personality not separate from the Government of Cuba. The Court will address both of Plaintiffs' arguments, as well as the counter-arguments made thereto by Non–Party ETECSA, the Garnishees, and the Government.

### 1. Government of Cuba as Payee

Plaintiffs put forth several arguments in support of their contention that the payments made by the U.S. telecommunications carriers are in fact made to the Government of Cuba. Plaintiffs point out that the CDA only authorizes the President to provide for the "issuance of licenses for the full or partial payment *to Cuba* of amounts *due Cuba* as a result of the provision of telecommunications services." *See* Pls.' Post–Hearing Mem., at 10–11, *citing* 22 U.S.C. § 6004(3)(A) (emphasis added); *see also* 31 C.F.R. § 515.418(a) ("licenses may be issued for payment *to Cuba* for full or partial payment of amounts *due Cuba* as a result of the provision of telecommunications services") (emphasis added). Indeed, Plaintiffs represent that the original licenses granted by OFAC to the U.S. telecommunications carriers authorize only the transfer of funds "to Cuba." *See id.* at 12. Furthermore, in his certifications to Congress [made pursuant to section 1705(e)(6) of the CDA, 22 U.S.C.

§ 6004(e)(6) ], Plaintiffs point out that President Clinton has reported that the payments made by U.S. telecommunications companies to Cuba under licenses issued by OFAC are made "to the Government of Cuba," and not to some other Cuban entity. *See id.* at 10. Essentially, Plaintiffs cite statutes and regulations which, if read strictly, seem to indicate that the telecommunications carriers make their payments directly to the Government of Cuba.

The Court does take judicial notice that Cuba is a totalitarian state in which the government likely exercises such expansive control that it could be considered the *de facto* recipient of the funds owed for telecommunications services. The Court also notes that the Government of Cuba seems to have considered itself the payee in the following speech decrying the actions of this Court:

> There is a gentleman, one Judge King—"king" in English means "monarch"—and he seems to act as if he were a king. Well, this gentleman wants to deprive Cuba of *its* resources, to which we are entitled, of the payments which we are entitled to and which must be made to *us* for telephone links between the two countries, of which one part goes to the American company and the other part comes to *us*.
>
> Presently we are menaced by the danger that this judge may enforce an order he has issued, whereby—if it is complied with—*Cuba* would be stripped of the money which belongs to *us*, of payments which are essential for the telephone communications to continue.
>
> Whoever is interested, talking of 'flexibility,' of measures, of contacts between the two countries, should start buying carrier pigeons, because if they don't pay, *we* aren't going to provide free service to the United States. This would hamper communications between those who reside there and those who reside here.
>
> [N]obody can assume that there can be telephone links and that *we* are going to offer the service for free and that only an American company is going to profit by it.

Speech by Ricardo Alarcon, Pres. of Cuban Nat'l Assembly, Jan. 8, 1999 (trans. by Vicente J. de la Vega) (emphasis added).[19] This speech strongly implies that the Government of Cuba thinks of itself as the recipient of the payments from U.S. telecommunications carriers.

Neither Plaintiffs' arguments nor the character of the Cuban state are sufficient for this Court to hold that the U.S. telecommunications carriers make their payments to the Government of Cuba. Plaintiffs' strict literalist approach to the licenses ignores the fact that, for purposes of the FSIA, a "foreign state" includes any political subdivision thereof, including an agency or instrumentality of that foreign state. *See* 28 U.S.C. § 1603(a) (West 1998). The shorthand use of "Cuba" does not necessarily indicate that the licenses are issued by OFAC directly to the Government of Cuba, or that the U.S. telecommunications carriers' payments are made directly to the Government of Cuba. Similarly, the use of personal pronouns in Ricardo Alarcon's speech easily may be understood as standing for Cuban agencies and instrumentalities. Finally, the totalitarian nature of Cuba's regime does not warrant a conclusion that the Government of Cuba is the payee under the licenses. Failing to give due deference to the manner in which the telecommunications industry in Cuba actually is organized and operated would be manifestly unjust, especially given this own nation's significant regulatory control over the telecommunications industry. Accordingly, the Court declines to find that the payments under the U.S.

---

**19.** The Government of Cuba apparently made good on its threat, suspending direct dial telephone service connections with the United States on February 25, 1999. *See Cuba Cuts Off Direct Phone Service From U.S.,* N.Y. *Times,* Feb. 26, 1999, *reprinted in* 1999 WL–NY 9905604402.

telecommunications licenses are made to the Government of Cuba.

### 2. *ETECSA as Payee*

A Cuban entity named Empresa de Telecomunicaciones de Cuba ("EMTEL-CUBA")[20] was the original party to the operating agreements with U.S. telecommunications carriers. On August 17, 1994, Empresa de Telecomunicaciones de Cuba, S.A. ("ETECSA") was granted the concession previously given by the Government of Cuba to EMTELCUBA to operate the country's telephone system. *See* Decl. of Juan M. Villanueva Sedes, at ¶ 2. Between January and April 1995, ETECSA assumed the rights and obligations owed to the United States telecommunications carriers under the operating agreements. *See* Second Decl. of Dr. Jorge Andres Antunez Couselo, at ¶ 9. In May and July 1995, ETECSA entered into operating agreements with two Puerto Rican telecommunications carriers. *See id.* at ¶ 10. Under all the agreements, the United States carriers seem to have to pay ETECSA for connecting calls from their U.S. customers to individuals or entities in Cuba. *See id.* Therefore, · ETECSA seems to be the payee under the arrangements for international telephone service between the United States (including Puerto Rico) and Cuba.[21] *See* Affs. of Donald Delaski, at ¶¶ 6–9; Victoria Rivera, at ¶¶ 3–6; Robert Santana, at ¶¶ 3–6; John Acosta, at ¶¶ 3–6. Understanding the consequences of this in terms of Plaintiffs' ability to execute their judgment requires a judicial determination of the legal status of ETECSA, which in turn commands knowledge of ETECSA's corporate ownership.

ETECSA incorporated under the laws of Cuba on June 28, 1994. *See* Second Couselo Decl., at ¶ 2. ETECSA has only the following five shareholders: (1) Telefonica Antillana, S.A. ("TELAN"), a Cuban corporation owning 51.00% of shares; Banco Financiero Internacional, S.A. ("BFI"), a Cuban corporation owning 6.68% of shares; Banco Internacional de Comercia, S.A. ("BICSA"), a Cuban corporation owning 1.00% of shares; STET International Netherlands N.V. ("SIN"), a Dutch corporation owning 29.29% of shares; and Universal Trade and Management Corporation ("UTISA"), a Panamanian corporation owning 12.03% of shares. *See* Decl. of Mario de Sena, at ¶ 2. Together, Cuban government-owned or controlled corporations hold a majority interest in ETECSA, with a combined 58.68% share. *See* Decl. of Michael E. Ranneberger, at ¶ 6.

### 3. *Legal Status of ETECSA*

■ ETECSA appears to be an "agency or instrumentality of a foreign state" under the FSIA. The FSIA defines an "agency or instrumentality of a foreign state" as an entity

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (West 1998). ETECSA is a separate legal corporation, the majority of whose shares are owned by corporations owned or controlled by the Government of Cuba. Accordingly, the Court finds that ETECSA, the recipient of payments by the U.S. telecommunications carriers, is a government instrumentality.

---

**20.** EMTELCUBA was an enterprise established by the Cuban Ministry of Communications, although allegedly independent therefrom. *See* Second Couselo Decl., at ¶ 2.

**21.** In 1998, the monthly receipts paid to ETECSA by all the Garnishees allegedly averaged approximately $6.7 million per month and totaled approximately $80 million for the year. *See* Fourth Decl. of Mario de Sena, at ¶ 2.

### a. Law on juridical status of government instrumentalities

In 1983, the Supreme Court attempted to elucidate the somewhat ambiguous distinction between a government agency and a government instrumentality. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 624, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (hereinafter, *"Bancec "*). The Court described a "typical" government instrumentality as an entity that

> is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Id.* In determining the independence of a foreign government instrumentality, the Court warned of giving conclusive effect to the law of the chartering state, which would inappropriately "permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts." *See id.* at 621–22, 103 S.Ct. 2591. Ultimately, the Court determined that such a government instrumentality, if truly distinct and independent from its sovereign, ought to be treated as such by federal courts. *See id.* at 626–27, 103 S.Ct. 2591.

Although the *Banco* court afforded foreign government instrumentalities a presumption of separate juridical status, it did provide two situations in which the presumption could be overcome. First, if the foreign government so extensively controls the instrumentality such that their relationship is one of principal and agent, the instrumentality may be held liable for the government's actions. *See id.* at 629, 103 S.Ct. 2591. Second, the Court held that the separate corporate status could be disregarded when doing so would prevent fraud or injustice. *See id.* In further explication of this second exception, the Court cited various precedents for the proposition that the corporate form may be ignored when failure to do so would defeat an overriding legislative and/or public policy. *See id.* at 630, 103 S.Ct. 2591. The *Banco* court offered no mechanical formula for determining whether the presumption of separate juridical status ought to be disregarded. *See id.* at 633, 103 S.Ct. 2591. Instead, the Court advocated looking at all factual circumstances, as well as applying "internationally recognized equitable principles to avoid [ ] injustice," including the obligations of international law. *See id.* at 633–34, 103 S.Ct. 2591.

In 1987, the Eleventh Circuit Court of Appeals applied *Banco* to determine "whether the assets of a foreign-state's wholly-owned national airline are subject to execution to satisfy a judgment obtained against the foreign state where the airline was neither a party to the litigation nor was in any way connected with the underlying transaction giving rise to the suit." *Hercaire Int'l, Inc. v. Argentina,* 821 F.2d 559, 563 (11th Cir.1987). In *Hercaire,* the Eleventh Circuit reversed the district court's decision to allow execution against the property Aerolinas, an airline 100%-owned by the government of Argentina, to satisfy a judgment against Argentina in a breach of contract action. The *Hercaire* court concluded that neither of the exceptions carved out in *Banco* applied: there was insufficient showing of extensive control so as to warrant a finding that the Government of Argentina and Aerolinas were in a principal-agent relationship, and no fraud or injustice would result from applying the presumption. *See id.* at 565.

The Supreme Court in *Banco* and the Eleventh Circuit in *Hercaire* both applied

a presumption of independent juridical status to the instrumentalities of foreign states. Because neither court found the presumption to be overcome by the particular facts in front of them, both ruled that the respective instrumentality's property could not be executed in order to satisfy a judgment against the respective foreign state. Employing a similar analysis, this Court now must determine whether or not ETECSA retains separate juridical status from the Government of Cuba.

### b. Application of the *Banco* rationale to ETECSA

ETECSA and the Garnishees argue that *Banco* requires the conclusion that ETECSA is a government instrumentality with a juridical personality distinct and separate from the Government of Cuba. These Parties proffer that, under Cuban law, ETECSA is classified as a "mixed enterprise," meaning a corporation whose shareholders include both Cuban and non-Cuban corporations. *See* Couselo Decl., at ¶ 7. Under Cuban law, this designation allegedly implies a legal status distinct from that of its shareholders. *See* First Decl. of Prof. Denio Daniel Camacho Hernandez, at ¶¶ 6–11, *citing* Law 77, Foreign Inv. Law, Art. 13.1; Cuban Civ.Code, Arts. 160.2, 39.1; Cuban Const., Art. 17; Cuban Civ.Code, Art. 44.3. The Garnishees and ETECSA submit various declarations by Cuban nationals that advise the Court that this independent legal status means that ETECSA is not responsible for the debts or obligations of its shareholders or any third party, and that its equity and assets are owned exclusively by it, and not by its shareholders or any third party. *See id.; see also* Second Hernandez Decl., at ¶¶ 3–17. The Cuban nationals submit further that the only payments ETECSA makes to the Cuban government are (1) taxes and fees generally applicable to all enterprises doing business in Cuba, and (2) payments for the use of services or lease of certain

telecommunications facilities and/or equipment. *See* Second Sena Decl., at ¶ 2. Furthermore, the Cuban nationals state that ETECSA's funds are not intermingled with those of the Cuban government, and that ETECSA bills the Cuban government for the telecommunications services rendered to it. *See* Third Sena Decl., at ¶¶ 2, 4. Although an officer of the U.S. Department of State affirmed the foregoing characterizations of ETECSA, he expressly limited his knowledge to "information provided by ETECSA and its legal counsel to the U.S. Government." *See* Ranneberger Decl., at ¶¶ 6–7.

Irrespective of ETECSA's status as a mixed enterprise under Cuban law, Plaintiffs provide declarations in support of their contention that the Cuban government has strong enough control over ETECSA such that the latter should not be treated as a separate juridical entity.[22] For example, the Cuban government owns the telephone lines ETECSA uses to provide its services. *See* Decl. of Prof. Jaime Suchlick, Exh. A, at 3; *see also* Decl. of Agustin de Goytisolo & Avelino J. Gonzalez, at ¶ 9, *citing* Cuba Const. of 1992, Art. 15 (providing that the "communications channels" within Cuba are the socialist property of the people). In addition, Cuban ministries and/or agencies provide all domestic employees to ETECSA, except for certain members of management or administration. *See* Goytisolo & Gonzalez Decl., at ¶ 8, *citing* Law–Decree 77 Art. 33(1) and 34(1). In essence, Plaintiffs aver that the Government of Cuba provides the machinery and manual labor without which ETECSA could not function.

■ The declarations of both the Cuban and American nationals establish that ETECSA is a government instrumentality as described by the *Bancec* court. Accordingly, it is afforded the presumption of independent juridical status. In this case, however, the Court concludes that this presumption is overcome. The Court

---

**22.** These declarations are undisputed by the declarations submitted by ETECSA and the Garnishees.

notes that, although ETECSA *legally* appears to be independent from the Cuban government, it does not appear to be independent *practically*. The Court expresses some concern that allowing the Cuban law on mixed enterprises totally to govern would prevent the victims of this terrorist attack from being compensated for the gross violation of international law committed by Cuba. However, the Court does not rest its conclusion that the *Bancec* presumption is overcome in this case on any evaluation of Cuban corporate law.

Plaintiffs argue that the fact that the Government of Cuba controls all telecommunications equipment and facilities in that country, as well as supplies and pays the vast majority of ETECSA's labor force, renders the relationship between the two as one between principal and agent. Plaintiffs again rest much of their argument on the ground that Cuba is a totalitarian state, the economy of which is controlled in large part by the state. However, the Court finds that these facts do not mean that the Government of Cuba exercises control over ETECSA such that ETECSA is its agent. Since ETECSA leases its equipment and facilities from the Government of Cuba, it presumably has certain contractual rights thereto, even if it lacks ownership rights. Furthermore, Cuban law apparently does not require that the Government appoint the administration of a mixed enterprise—ETECSA is administered by a Board of Directors chosen by its non-Cuban minority shareholder in alternate years. The idea that, because Cuba is a totalitarian state, all economic actors within the nation are its agents seems slightly overzealous. Although their relationship may bear some similarities to that between a principal and an agent, the Court does not conclude that the relationship between the Government of Cuba and ETECSA is so similar that the *Banco* presumption of independent juridical status is overcome.

The Court does conclude, however, that the *Banco* presumption is overcome by the second exception provided for in that case. For this Court to fail to disregard the separate corporate status of ETECSA not only would prevent Plaintiffs from collecting their court-ordered final judgment for the victims of a grave violation of international law, but also would override the clear legislative policy against such terrorist attacks and in favor of broadening the property which may be executed to compensate for them. In the last three years, Congress has placed considerable doubt on the current viability of *Banco* and *Hercaire* in circumstances such as these. In 1996, Congress amended the FSIA to allow victims of terrorist attacks to bring actions such as this one. More important, late last year Congress again amended the FSIA by passing section 117. This Court has concluded that the President's waiver of the entirety of section 117 was beyond the scope of the authority granted to him by Congress. As such, that the new 28 U.S.C. § 1610(f)(1) remains the law of the land. That subsection evinces the Congressional decision to subject licenses to attachment or execution "of any judgment relating to a claim for which a foreign state (including any agency or instrumentality, of such state) claiming such property is not immune under section 1605(a)(7)." The Congressional purpose in significantly broadening the property subject to execution would be jeopardized significantly if the Court were not to decide that the *Banco* presumption is overcome in the present case. Although this decision may inflict injustice on ETECSA and its other creditors, the Court finds itself bound to interpret ETECSA's legal status in light of the expressed legislative commitment to subject the property of a government instrumentality to attachment or execution to satisfy a judgment against the terrorist foreign state. Accordingly, the Court finds that, at least for the purposes of this case, ETECSA is not a separate juridical entity from the Government of Cuba.

### C. Location of Payments Made by U.S. Telecommunications Carriers to ETECSA

Garnishees argue that, since their contracts with ETECSA mandate that pay-

ments thereto be made to and from Canadian bank accounts, said payments are immune from garnishment. *See* Carriers' Joint Mot. To Dissolve Writs of Garnishment and To Quash Service, at 10–11, *citing* Affs. of Donald Delaski, at ¶¶ 10–12; Robert Santana, at ¶¶ 17–8, John Acosta, at ¶¶ 7–8; Victoria Rivera, at ¶¶ 7–8. ETECSA explains that the terms of the operating agreements dictate that, to be effective and to relieve their obligations to ETECSA, the payments of the U.S. telecommunications carriers must be made in a bank outside of the United States and in currency other than U.S. dollars. *See* ETECSA's Mot. To Dissolve Writs of Garnishment, at 36–38; *see also* Fourth Sena Decl., at ¶ 3. While Plaintiffs do not dispute that the payments made by the U.S. telecommunications companies to ETECSA are made through Canadian bank accounts, they nevertheless maintain that the debts are within the United States and thus subject to garnishment. *See* Pls.' Post–Hearing Mem., at 23–25.

The section upon which Plaintiffs' bring their action provides that "[t]he property *in the United States* of a foreign state … *used for a commercial activity in the United States* shall not be immune from attachment in aid of execution, or from execution …" 28 U.S.C. § 1610(a)(7) (West 1998) (emphasis added).[23] Therefore, this Court must decide whether the payments made by the licensees to ETECSA are in the United States and are used for commercial activity in the United States.

The Garnishees and ETECSA argue that both the section 1610(a)(7) prerequisites are absent in this case because (a) the payments are held and exchanged in Canada, and (b) the commercial services for which they are payment—the connection of calls to and from Cubà—occurs outside the territorial boundaries of the United States. *See, e.g.,* ETECSA's Mot. To Dis-

solve Writs of Garnishment, at 37, *citing* Decl. of John Nichols, at ¶ 12. In response, Plaintiffs maintain that the payments have the following significant connections with the United States: (1) they are paid by U.S. national companies, (2) they represent the proceeds of services provided by the U.S. telecommunications carriers to their customers in the United States; (3) they owe their existence to regulations promulgated by the United States government; and (4) they have no connection with Canada, but for their placement within a bank in that nation. *See* Pls.' Proposed Findings of Fact, at Part II, ¶ 10. Alternatively, Plaintiffs argue that this Court should disregard the fact that the payments are made to and from Canadian bank accounts in order not to allow the Garnishees and ETECSA to channel their funds in such a way as to defeat U.S. jurisdiction. *See id., citing Cleveland Trust Co. v. Foster,* 93 So.2d 112, 114 (Fla.1957) (including pending or threatened litigation as indicia of fraud used to set aside fraudulent conveyances).

The Court finds that the payments made by the telecommunications carriers to ETECSA qualify as property within the United States, notwithstanding the fact that they ultimately are exchanged in Canadian bank accounts. Since the telecommunications carriers get the funds through which they make their payments from customers in the United States, and likely deposit those funds into an account in the United States before transferring it to the Canadian account, the payments have been in the United States for purposes of this Court's ability to exercise jurisdiction over them. Furthermore, because these payments are monetary property that this Court has determined exist in the United States for jurisdictional purposes, they by definition are used by ETECSA—as governmental instrumentali-

---

**23.** In limiting the scope of its legislative mandate, Congress recognized a long-standing principle of *in rem* jurisdiction. *See State v. White,* 155 Fla. 591, 21 So.2d 213, 215 (1944) ("A court has no jurisdiction to adjudicate the right of action in the rem when the property in controversy is without the limits of the court's jurisdiction and its process cannot reach the locus in quo.").

ty for the Government for Cuba—for commercial activity in the United States. The fact that the connection service may occur somewhere in the international waters between the United States and Cuba does not alter the fact that the commercial venture between the Garnishees and ETEC-SA either begins or ends within the United States. Given these determinations, and in light of Congress' express purpose of subjecting these licenses to attachment or execution in these circumstances, the Court finds that the payments are located in the United States. As such, they may be garnished to satisfy this Court's Final Judgment in favor of Plaintiffs.

### D. Service of Writs of March 16, 1999 Garnishment

Garnishees seek to quash service as to the Writs of Garnishment because the Writs were served upon them by private process servers rather than by the United States Marshal Service. Garnishees argue that, absent Court appointment, applicable federal law mandates that service be effected by a United States Marshal. In response, Plaintiffs suggest that the failure to serve the Writs by a U.S. Marshal does not render service invalid and, to the extent that service by private process is defective, it should be regarded by this Court as harmless error.

■ Rule 69 of the Federal Rules of Civil Procedure ("FRCP") states that the process to enforce a monetary judgment shall be a writ of execution. Rule 69 explicates the procedure for service of a writ of execution as the following:

> The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be *in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is*

sought, *except that any statute of the United States governs to the extent that it is applicable.*

Fed.R.Civ.P. 69(a) (West 1998) (emphasis added). The Florida Rules of Civil Procedure address process to enforce final judgments only by stating that such process "shall be by execution, writ of garnishment, or other appropriate process or proceedings." Fla.R.Civ.P. 1.570 (West 1998). Since Rule 1.570 does not address by whom service may be made, Florida's general rule regarding service of process governs. Rule 1.070 provides that service of process "may be made by an officer authorized by law to serve process, but the court may appoint any competent person not interested in the action to serve the process." Fla.R.Civ.P. 1.070 (West 1998).

■ The FRCP conflict with the Florida rule. Since the FRCP have the force and effect of a statute of the United States, *see* 28 U.S.C. § 2072 (West 1998), Rule 4.1 governs who may serve a writ of execution issued by federal court. *See Schneider v. National R.R. Passenger Corp.*, 72 F.3d 17, 19–20 (2nd Cir.1995); *Oklahoma Radio Assocs. v. Federal Deposit Ins. Corp.*, 969 F.2d 940, 942 (10th Cir.1992); *United States for use of Tanos v. St. Paul Mercury Ins. Co.*, 361 F.2d 838, 839 (5th Cir.1966).[24] Rule 4.1 requires that "[p]rocess other than a summons as provided in Rule 4 or subpoena as provided in Rule 45 shall be served by a United States Marshal, a Deputy United States Marshal or a person specially appointed for that purpose." Fed.R.Civ.P. 4.1 (West 1998).

The Writs of Garnishment issued by the Clerk of the Court on December 9, 1998 specifically commanded the United States Marshal to summon the Garnishees to serve an Answer. *See* Writs of Garnishment. Neither the Court nor the Clerk of the Court [25] specifically appointed a private

---

**24.** The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**25.** In this District, the Clerk of the Court is authorized to sign and enter orders specially appointing persons to serve process. *See* Admin. Order 82–2–Civil–Misc., S.D.Fla.

process server to serve Garnishees; rather the Writs were explicitly directed to the United States Marshal. *See id.* Nevertheless, private process servers employed by Civil Process Plus, Inc. of Miami, Florida—rather than a United States Marshal—served the Writs of Garnishment on Garnishees. *See* Affs. of Service. Garnishees move this Court to quash service due to Plaintiffs' failure to serve by a United States Marshal.

Plaintiffs acknowledge that binding precedent within this Circuit requires that a writ of garnishment be served by a United States Marshal. *See* Pls.' Post–Hearing Mem., at 26, *citing St. Paul Mercury Ins.*, 361 F.2d 838. Nevertheless, Plaintiffs urge the Court to reject that precedent and follow a Seventh Circuit Court of Appeals decision, which held that Rule 69 was not intended to be a procedural impediment to enforcement of a judgment where the purpose of providing notice and thus safeguarding due process has been met. *See id.* at 27, *citing Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226–27 (7th Cir.1993). Although the Court does find the Seventh Circuit's approach to be imminently reasonable, it is bound by the Fifth Circuit precedent mandating that writs of garnishment be served by a United States Marshal.

Plaintiffs' alternative argument for why service to the Garnishees should not be quashed rests on Rule 61 of the FRCP. Rule 61 brings the common law doctrine of harmless error into federal courts, mandating that courts "at every stage of the proceeding [ ] disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed.R.Civ.P. 61 (West 1998). Plaintiffs cite to cases in other districts holding that the failure of a United States Marshal to serve a post-judgment writ to be harmless error under Rule 61. *See* Pls.' Post–Hearing Mem., at 28, *citing Apostolic Pentecos-*

*tal Church v. Colbert*, 173 F.R.D. 199 (E.D.Mich.1997); *Thomas v. Yonkers Police Dep't Transp. Unit*, 147 F.R.D. 77, 79 (S.D.N.Y.1993). In essence, Plaintiffs urge the Court to hold that, so long as the objective of service of process—namely, providing actual notice to the Parties whose rights may be affected by litigation proceedings—is met, technical defects in the service of process should be disregarded.

The Court finds Plaintiffs' argument regarding harmless error to be persuasive for three reasons. First, the licensed private process serving company was registered with and approved by the Court of Eleventh Judicial Circuit in and for Miami, Florida [the state court district in which this federal district court resides]. Second, the substantial rights of the Garnishees do not appear to have been prejudiced at all by the technical defect in service of the Writs of Garnishment—they answered the first Writs, submitted a Motion To Dissolve the Writs, and took part in Oral Argument. Third, this Court easily could appoint the licensed private process server employed by Plaintiffs to serve the Writs, *nunc pro tunc*. These facts weigh heavily in favor of this Court's finding that, given the circumstances of this case, the technical defect in service of the Writs of Garnishment constitutes harmless error.[26]

Since Plaintiffs now understand applicable law to require that writs of garnishment be served by a United States Marshal, surely they will seek to have a United States Marshal serve the second Writs of Garnishment, should this Court decide to grant Plaintiff's Motion For Second Writ Of Garnishment. However, Plaintiffs need not do so. This Court specifically authorizes the licensed private process server employed by Plaintiffs in serving the first Writs of Garnishment—namely, Civil Pro-

---

**26.** The Court employs similar reasoning with respect to the technical defect regarding service of the first Writs of Garnishment on WorldCom, AT & T–PR, and TLD–PR, which allegedly occurred outside the state of Florida. Accordingly, service of those writs is not quashed.

cess Plus, Inc. of Miami, Florida—to serve any second Writ of Garnishment.

### IV. Rulings of the Court

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Plaintiff's Motion To Enforce Writ Of Execution Served Upon AT & T Corp. be, and the same is hereby, DENIED. Under Florida law, a Writ of Execution is the appropriate mechanism for satisfying a judgment with real or personal property. *See* Fla.Stat.Ann. § 56.061 (West 1998); *see also Spradley v. Martin*, 897 F.Supp. 560, 566 (M.D.Fla.1995). The proper mechanism for recovering the payments of the U.S. telecommunications carriers is through a Writ of Garnishment. *See* Fla. Stat.Ann, § 77.01 (West 1998). Plaintiffs apparently recognized this, and accordingly served AT & T, as well as the other carriers, with a Writ of Garnishment. Accordingly, the Writ of Execution is moot. It is further

ORDERED and ADJUDGED that Plaintiffs' Motion For Second Writ Of Garnishment After Judgment be, and the same is hereby, GRANTED IN PART. The Clerk of the Court is hereby DIRECTED to issue a Writ of Garnishment against Sprint Corporation, the only new Garnishee in Plaintiff's Motion For Second Writ compared to Plaintiff's Motion For [First] Writ. Service of this Writ may be made by a United States Marshal or a licensed private process server employed by Civil Process Plus, Inc. of Miami, Florida. It is further

ORDERED and ADJUDGED that, in accordance with Federal Rule of Civil Procedure 69 and pursuant to 28 U.S.C. §§ 1610(a)(7) and (f)(1), all assets subject to the Treasury Department's Cuban Assets Control Regulations and owed to ETECSA in the control and/or possession of Garnishees be, and the same are hereby, GARNISHED in aid of execution of the Final Judgment entered in the above-styled matters by this Court on December 17, 1997. This Court has given due consid-

eration to all the arguments put forth by the eight Garnishees that answered the Writ of Garnishment issued by the Clerk of the Court. Having found them unavailing, Plaintiffs are entitled to Cuba's blocked assets. In accordance with Fla. Stat. § 77.083, judgment is hereby ENTERED against the Garnishees for the following amounts, representing their indebtedness to ETECSA as put forth in their respective Answers:

1. $4,149,119.11 against AT & T Corporation;
2. $342,746.60 against WilTel, Inc.;
3. $17,683.40 against Telefonica Larga Distancia de Puerto Rico, Inc.;
4. $1,052.501.90 against MCI International, Inc.;
5. $248,849.40 against IDB WorldCom Services, Inc.; and
6. $401,711.09 against MCI WorldCom, Inc.

Although they failed to specify amounts of their indebtedness to ETECSA in their Answers, judgment is hereby ENTERED against AT & T of Puerto Rico, Inc. and The Chase Manhattan Corporation and its subsidiaries in the amounts of their respective indebtedness to ETECSA. Having failed to answer the Writs of Garnishment served upon them, default judgment is hereby ENTERED against Global One Communications, L.L.C. and Citigroup, Inc. and its subsidiaries in the amounts of their respective indebtedness to ETECSA. It is further

ORDERED and ADJUDGED that Carriers' Joint Motion To Dissolve Writs Of Garnishment And To Quash Service be, and the same is hereby, DENIED. It is further

ORDERED and ADJUDGED that Non–Party Empresa De Telecomunicaciones De Cuba, S.A.'s Motion To Dissolve Writs Of Garnishment be, and the same is hereby, DENIED.