Marlene ALEJANDRE, individually and as personal representative of the Estate of Armando Alejandre, deceased, Mirta Mendez, as personal representative of the estate of Carlos Alberto Costa, deceased, et al., Plaintiffs-Appellees,

v.

TELEFONICA LARGA DISTANCIA DE PUERTO RICO, INC.; MCI International, Inc.; et al., Garnishees-Appellants.

No. 99-10225.

United States Court of Appeals,

Eleventh Circuit.

Aug. 11, 1999.

Appeal from the United States District Court for the Southern District of Florida. (Nos. 96-10126-CV-JLK, 96-10127-CV-JLK, 96-10128-CV-JLK), James Lawrence King, Judge.

Before TJOFLAT and DUBINA, Circuit Judges, and O'KELLEY[*], Senior U.S. District Judge.

TJOFLAT, Circuit Judge:

In this garnishment action, the district court permitted the plaintiffs to collect a portion of their judgments against the Republic of Cuba (the "Cuban Government") and the Cuban Air Force by garnishing certain debts owed to a Cuban telecommunications company. Because we conclude that this company is an entity separate from the Cuban Government, we vacate the judgment of the district court and remand this case with instructions to dissolve the writs of garnishment.

I.

This case grows out of a decision by the Cuban Government, carried out by pilots of the Cuban Air Force, to shoot down two unarmed civilian airplanes over international waters on February 24, 1996. Three citizens of the United States and one non-citizen were killed in the attack. On October 31, 1997, the personal representatives of the estates of the three citizens, plaintiffs herein, brought actions in the United States District Court for the Southern District of Florida seeking monetary damages from the Cuban Government and the Cuban Air Force. Although neither defendant entered an appearance, the district court conducted a

---

[*]Honorable William C. O'Kelley, Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

trial in order to determine whether the plaintiffs had satisfactory evidence to support their claims. *See* 28 U.S.C. § 1608(e) (1994) (prohibiting default judgment against foreign sovereign unless plaintiff establishes claim "by evidence satisfactory to the court").

On December 17, 1997, the district court entered judgment for the plaintiffs and awarded them compensatory damages of $49,927,911 against the Cuban Government and Cuban Air Force, as well as punitive damages of $137,700,000 against the Cuban Air Force alone.[1] *See Alejandre v. Republic of Cuba,* 996 F.Supp. 1239, 1253-54 (S.D.Fla.1997) [hereinafter *Alejandre I* ]. In an opinion accompanying the judgment, the court found that the defendants were not immune from the plaintiffs' suits because the Cuban Air Force (as an agent of the terrorist-sponsoring Cuban Government) had committed an act of extrajudicial killing by shooting down the airplanes. *See* 28 U.S.C. § 1605(a)(7) (Supp. II 1996); *Alejandre I,* 996 F.Supp. at 1247-48. The court also concluded that the defendants were substantively liable to the plaintiffs, under a theory of *respondeat superior,* for the actions of the Cuban Air Force pilots who shot down the airplanes. *See* Pub.L. No. 104-208, § 589, 110 Stat. 3009-172 (codified at 28 U.S.C.A. § 1605 note (West Supp.1999)); 28 U.S.C.A. § 1606 (West Supp.1999) (providing that a non-immune foreign state "shall be liable in the same manner and to the same extent as a private individual under like circumstances"); *Alejandre I,* 996 F.Supp.

---

[1]The family and estate of each citizen were awarded one-third of the damages. Originally, the district court did not award punitive damages against the Cuban Government because 28 U.S.C. § 1606 (1994) provided that a foreign state could not be liable for such damages. Section 1606 was later amended to allow punitive damages against a foreign state in a suit from which the state was not immune under 28 U.S.C. § 1605(a)(7) (Supp. II 1996); this amendment applied to causes of action arising before, on, or after October 21, 1998. *See* Pub.L. No. 105-277, § 101(h) [Title I, § 117], 112 Stat. 2681, 2681-491 (1998). The President promptly acted to waive the "requirements" of the statutory section that contained this amendment. *See* Pres. Determination No. 99-1, 63 F.R. 59201 (1998) (reprinted in 28 U.S.C.A. § 1610 note (West Supp.1999)). (We express no opinion regarding the scope of the President's waiver authority.)

On November 5, 1998, nearly eleven months after the district court entered final judgment, the plaintiffs moved the court to amend the judgment in order to make the Cuban Government jointly liable for the punitive damages awarded against the Air Force. The district court entered an order granting the motion the same day. The President's purported waiver aside, we question whether the district court had jurisdiction to enter this order. Because we resolve the entirety of this appeal on other grounds, however, we need not pass upon the district court's decision to augment the plaintiffs' damages against the Cuban Government.

2

at 1249.

In an effort to collect a portion of this judgment against the Cuban Government and the Cuban Air Force, the plaintiffs filed a motion pursuant to Fed.R.Civ.P. 69(a)[2] and Fla. Stat. ch. 77.03 (1997) requesting that post-judgment writs of garnishment be issued to the following companies (the "garnishees"): AT&T Corp.; AT&T of Puerto Rico, Inc.; Global One Communications, L.L.C.; IDB WorldCom Services, Inc.; MCI International, Inc.; Telefonica Larga Distancia de Puerto Rico, Inc. ("TLD"); WilTel, Inc.; WorldCom, Inc. (collectively, the "carrier garnishees" or the "carriers"); the Chase Manhattan Corporation and its subsidiaries; and Citigroup Inc. and its subsidiaries. On December 9, 1998, the district court granted the motion and directed the clerk to issue the requested writs. Each writ asked the garnishee to serve an answer stating whether it was indebted to "the Cuban Air Force or the Republic of Cuba (including any of its agencies, entities, or instrumentalities), ... and in what sum."[3] The garnishees answered the writs by stating, *inter alia,* that they were indebted to Empresa de Telecomunicaciones de Cuba, S.A. ("ETECSA").[4] They

---

[2]Rule 69(a) provides:

> Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

[3]This vague reference to "agencies, entities, or instrumentalities" was made a part of the language of the writs issued by the clerk after the district court granted the plaintiffs' motion. For a discussion of the procedural due process concerns that this addition raises, see note 21, *infra.*

[4]Garnishees Citigroup Inc. and Global One Communications, L.L.C., failed to answer the writs. The district court entered a default judgment garnishing any amounts owed ETECSA in their possession or control.

> Of the garnishees that did answer the writs, AT&T Corp. also identified debts owed to Cuban entities other than ETECSA. The Chase Manhattan Corporation's answer did not mention ETECSA by name, but it did identify numerous accounts in which the Cuban Government, the Cuban Air Force, or other Cuban entities had or may have had an interest. The district court judgment presently on appeal, however, addressed only debts owed to ETECSA. Thus, we do not consider the debts owed to other Cuban entities by AT&T and Chase Manhattan.

3

also claimed that their debts to ETECSA were not subject to garnishment for several reasons, including: (1) that ETECSA was a separate entity not responsible for the debts of the Cuban Government; and (2) that the writs were void because the plaintiffs had failed to get a license to garnish ETECSA's property as required by the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. pt. 515 (1998). *See* 31 C.F.R. § 515.203(e) (1998). The plaintiffs replied by denying the garnishees' claims and by affirmatively asserting that any indebtedness owed to ETECSA constituted an indebtedness to the Cuban Government.

On February 4, 1999, the carrier garnishees filed a joint motion to dissolve the plaintiffs' writs of garnishment pursuant to Fla. Stat. ch. 77.07(2) (1997).[5] ETECSA, which had been served with a notice of garnishment as required by Fla. Stat ch. 77.055 (1997), filed a similar motion to dissolve on February 8. These motions asked the court to dissolve the writs on several grounds, including those raised in the garnishees' answers. The district court conducted a bench trial on these motions and on the garnishment pleadings.[6] Rather than calling witnesses, all parties provided the court with factual background information through affidavits.

These affidavits contained the following relevant information regarding the relationship among ETECSA, the Cuban Government, and the carriers. Prior to a transition period that began in August 1994, the telephone system in Cuba was operated by Empresa de Telecomunicaciones de Cuba ("EMTELCUBA"),

---

[5]Although the plaintiffs did not raise the issue below, it could be argued that the carrier garnishees lacked standing to bring their motion to dissolve the writs. "The statutory right to move to dissolve [a writ of garnishment under Fla. Stat. ch. 77.07(2) ] is granted only to the defendant [—i.e., the judgment debtor—] and any other person having an *ownership interest* in the property, as disclosed by the garnishee's answer." *Navon, Kopelman & O'Donnell, P.A. v. Synnex Info. Techs., Inc.,* 720 So.2d 1167, 1168 (Fla. 4th DCA 1998) (emphasis added and original emphasis omitted). Some of the carriers' answers did claim a right to set off certain expenses against their debts to ETECSA, but it is unlikely that this claim could give the carriers standing to move to dissolve the writs on the ground that ETECSA is a separate entity not responsible for the Cuban Government's debts. Because the garnishees' answers raised this same ground as a defense to garnishment, however, it is appropriate for us to consider it here.

[6]Under Florida law, the garnishment pleadings—i.e., the plaintiffs' motion for the writs, the garnishees' answers, and the plaintiffs' replies—frame the issues for trial. *See* 13 *Florida Jur.2d* § 151 (1998).

a wholly-owned alter ego of the Cuban Government's Ministry of Communications.[7]  Between March and September 1994, all of the carriers except TLD and AT & T of Puerto Rico signed Operating Agreements with EMTELCUBA to provide international telecommunications services between Cuba and the United States.  In November 1994, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") granted these carriers licenses under the CACR that permitted them to make payments to EMTELCUBA as required by the Operating Agreements.  *See* 22 U.S.C.A. § 6004(e)(3)(A) (West Supp.1999) (authorizing the issuance of such licenses);  31 C.F.R. §§ 515.418(a), 515.542(c) (1998) (implementing this authorization).

---

[7]In order to facilitate our analysis of this case, we assume *arguendo* that EMTELCUBA is not a juridical entity separate from the Cuban Government's Ministry of Communications.  *See infra* part II.A. (explaining separate juridical status inquiry under FSIA and Florida garnishment law).  The present record provides strong support for this characterization.  Instead of being formed under pre-existing Cuban law (as ETECSA later was), EMTELCUBA was simply created by a resolution of the Ministry of Communications on December 23, 1976.  While this resolution stated that EMTELCUBA was to be a company "with its own juridical personality," the Supreme Court has recognized that such a characterization is not to be given conclusive effect.  *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 621-22, 103 S.Ct. 2591, 2597-98, 77 L.Ed.2d 46 (1983).  Indeed, in this case, the actual relationship between EMTELCUBA and the Ministry belies this assertion of separate juridical status.  As an organizational matter, EMTELCUBA is a national directorate of the Ministry of Communications that is under the oversight and control of the Ministry's Radio Communications directorate.  In addition, it was a Ministry press release that announced Operating Agreements between the carriers and "EMTELCUBA, of the Ministry of Communications" to provide U.S.-Cuba telephone service and that prescribed the rules under which the Cuban populace could utilize such service.  Finally, it seems that the Cuban Government unilaterally deprived EMTELCUBA of its business by granting ETECSA an exclusive concession to operate the Cuban telephone system in August 1994;  the Ministry then transferred certain telecommunications facilities and equipment to ETECSA.  The extent to which EMTELCUBA was compensated (separately from the Ministry) for the loss of its business and for the transferred facilities and equipment is unclear.

The licenses issued by the Office of Foreign Assets Control, which we discuss at greater length in the text, also lend support to the premise that EMTELCUBA is not separate from the Cuban Government.  For example, all of the licenses contain a reference to "*Cuba's* share of compensation due for its portion of the jointly provided international telecommunications service" (emphasis added).  In addition, all of the licenses (except those issued to TLD and AT&T of Puerto Rico after EMTELCUBA had lost its business) contain a clause that discusses certain deductions from the payments for telecommunications services "owed *to Cuba* under the Operating Agreement negotiated between [the carrier] and *EMTELCUBA* " (emphasis added).  Given that the Operating Agreements between EMTELCUBA and the carriers do not specifically entitle the Cuban Government to any compensation, the references to "Cuba" in the licenses could be read to suggest that EMTELCUBA is in fact part of the Cuban Government.  While we recognize that the term "Cuba" as defined by the CACR can also be read as a reference to an independent government instrumentality, *see* 31 C.F.R. §§ 515.201(d), 515.301 (1998), it would seem that the interchangeable use of the terms "Cuba" and "EMTELCUBA" in the licenses implies a closer connection between the two.

Each license provided, in pertinent part:

> All necessary transactions are hereby authorized incident to the execution and performance of the Operating Agreement [the carrier] has negotiated with Empresa de Telecomunicaciones de Cuba ("EMTELCUBA") for the provision of telecommunications service between the United States and Cuba.
>
> This license authorizes all necessary transactions in connection with the transfer to Cuba of funds representing Cuba's share of compensation due for its portion of the jointly provided international telecommunications service....

Meanwhile, on June 28, 1994, ETECSA was incorporated as a mixed enterprise under the provisions of a 1982 Cuban law. ETECSA's stock was held by the following entities at the time of trial: 51% by Telefonica Antillana, S.A. (a Cuban company); 6.68% by Banco Financiero Internacional, S.A. (a Cuban company); 1% by Banco Internacional de Comercia, S.A. (a Cuban company); 29.29% by STET International Netherlands N.V. (a Dutch subsidiary of the publicly-owned company Telecom Italia S.p.A.); and 12.03% by Universal Trade and Management Corporation (a Panamanian company). The three Cuban companies, which together held 58.68% of ETECSA's stock, are apparently owned or controlled by the Cuban Government.[8] On August 17, the Executive Committee of the Cuban Council of Ministers granted ETECSA an administrative concession to render public telecommunications services in Cuba. Under the terms of this concession, ETECSA was granted the exclusive right to supply national and international telephone and data transmission services for twelve years.

One result of this exclusive concession was that, between January and April 1995, each of the carriers that had an Operating Agreement with EMTELCUBA signed a document entitled "Amendment to Transfer Rights and Obligations." Each document, which EMTELCUBA and ETECSA also signed, stated that the signatories agreed to transfer all rights, obligations, and interests of EMTELCUBA under the Operating Agreements to ETECSA. They also agreed to release EMTELCUBA from any future rights, obligations, and interests under the Agreements. ETECSA subsequently negotiated additional Operating Agreements with TLD and AT&T of Puerto Rico; these two carriers received licenses from OFAC that permitted them to make

---

[8]*See Alejandre v. Republic of Cuba,* 42 F.Supp.2d 1317, 1336 (S.D.Fla.1999).

payments to ETECSA[9] under the Agreements. These Operating Agreements (whether transferred from EMTELCUBA or negotiated by ETECSA itself) were the source of the carriers' indebtedness to ETECSA.

After reviewing this factual information and holding a hearing on February 16, 1999, the district court issued an opinion disposing of the motions to dissolve and the issues raised by the garnishment pleadings. *See Alejandre v. Republic of Cuba,* 42 F.Supp.2d 1317 (S.D.Fla.1999) [hereinafter *Alejandre II* ]. As an initial matter, the court concluded that the carriers' debts were owed to ETECSA (rather than directly to the Cuban Government itself) and that the Cuban Government's control over ETECSA was insufficient to render ETECSA responsible for the Government's debt to the plaintiffs. *See id.* at 1334-39. Nevertheless, the court held ETECSA responsible for the Government's debt on the ground that a contrary holding would unjustly prevent the plaintiffs from collecting their judgment and would override the legislative policy in favor of broadening the assets that may be executed upon to compensate victims of terrorist attacks. *See id.* at 1339. The court also held that 28 U.S.C.A. § 1610(f)(1)(A) (West Supp.1999), which the President had not waived, permitted the plaintiffs to garnish amounts owed ETECSA without first obtaining a license under the CACR. *See id.* at 1327-34.[10] Therefore, the court denied the motions to dissolve and ordered that all amounts owed ETECSA in the possession or control of the garnishees be garnished in aid of execution of the plaintiffs' judgment against the Cuban Government. *See id.* at 1343. This appeal followed.

II.

The central question that we must answer on appeal is whether ETECSA is an entity separate from the Cuban Government, and therefore not responsible for the Government's debt to the plaintiffs. Our review

---

[9]The licenses issued to TLD and AT&T of Puerto Rico contained language identical to that previously quoted in text, except that the reference to "('EMTELCUBA')" was omitted. Thus, the name of the Cuban party in the first quoted paragraph simply read "Empresa de Telecomunicaciones de Cuba"; no "S.A." designation was added. While this name could be viewed as a reference to either ETECSA or EMTELCUBA, we think that the omission of the term EMTELCUBA indicates that the license was meant to authorize transactions incident to these carriers' agreements with ETECSA.

[10]Because we conclude that ETECSA is an entity separate from the Cuban Government that may not be held responsible for the Government's debt to the plaintiffs, we do not reach the issue of whether the President waived section 1610(f)(1)(A). We express no opinion regarding the district court's holding on this issue.

of the district court's decision to hold ETECSA responsible for this debt is guided both by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602-11 (1994), and by principles of Florida garnishment law.

## A.

### 1.

The FSIA is the exclusive source of subject matter jurisdiction over all civil actions against foreign states. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434-35, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989); *Hercaire Int'l, Inc. v. Argentina,* 821 F.2d 559, 563 (11th Cir.1987). Under section 1604 of the FSIA,[11] a foreign state is immune from the jurisdiction of federal or state courts unless one of the statutory exceptions to immunity applies. *See* 28 U.S.C. §§ 1605, 1607 (1994) (listing the exceptions); *see also* 28 U.S.C. § 1330(a) (1994) (granting district court jurisdiction over civil action against non-immune foreign state). In addition, section 1609 renders the property in the United States of a foreign state immune from execution or attachment (including garnishment[12]) unless sections 1610-11 provide otherwise. Because section 1603(a) declares that the term "foreign state" includes an agency or instrumentality of a foreign state as defined in section 1603(b), such agencies and instrumentalities also enjoy immunity from suit and execution. The district court found that ETECSA was a government instrumentality because the Cuban Government owned or controlled the companies that held a majority of ETECSA's stock. *See* 28 U.S.C. § 1603(b)(2) (1994); *Alejandre II,* 42 F.Supp.2d at 1336. This ruling is not challenged on appeal. ETECSA's property in the United States is therefore immune from garnishment unless an exception applies.[13]

---

[11]Unless otherwise indicated, all subsequent section references are to the 1994 edition of volume 28, United States Code.

[12]*See* H.R.Rep. No. 94-1487, at 28 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6627.

[13]We note that there are two reasons—neither of which has been raised on appeal—to question whether ETECSA's property is in fact immune from garnishment. First, there is a circuit split (which the district court did not address) on the issue of whether a company that is majority-owned by another company that is in turn owned or controlled by a foreign state can be described as a company "a majority of whose shares ... is owned by a foreign state or political subdivision thereof" in order to meet the requirement for instrumentality status

The exception upon which the plaintiffs relied below is 28 U.S.C. § 1610(a)(7) (West Supp.1999),[14] which provides:

> The property in the United States of a foreign state, ... used for a commercial activity in the United States, shall not be immune from attachment in aid of execution ... upon a judgment entered by a court of the United States ... [if] the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

The last requirement of this exception is clearly met here, as the plaintiffs' underlying judgment against the Cuban Government related to a claim from which the Government was not immune by virtue of section 1605(a)(7). Thus, assuming *arguendo* that the amounts owed to ETECSA are property in the United States used for a commercial activity therein,[15] these amounts are not immune from garnishment if ETECSA constitutes a "foreign state" for purposes of this exception. This question might appear to be easily answered: ETECSA is an instrumentality as defined by section 1603(b), and section 1603(a) declares that the term "foreign state" under the FSIA includes an instrumentality, so ETECSA is a "foreign state" under section 1610(a)(7). The Supreme Court's decision in *First National City Bank v. Banco Para El Comercio Exterior*

---

under section 1603(b)(2). *Compare In re Air Crash Disaster Near Roselawn, Ind.,* 96 F.3d 932, 939-41 (7th Cir.1996) (yes), *with Gates v. Victor Fine Foods,* 54 F.3d 1457, 1460-63 (9th Cir.1995) (no). Second, it is unclear whether ETECSA waived its immunity by filing its motion to dissolve the writs of garnishment as a "non-party" under Fla. Stat. ch. 77.07(2) and then asserting that it has standing to appeal the denial of that motion to this court.

> We need not resolve these questions, however, because ETECSA's immunity or lack thereof does not ultimately alter our analysis. Under the circumstances of this case, as we explain in greater detail below, we conduct exactly the same inquiry in order to determine both whether an exception to the Cuban Government's immunity from garnishment also applies to ETECSA and whether ETECSA can be held substantively liable for the Government's debt to the plaintiffs: namely, whether the plaintiffs have overcome the presumption that ETECSA is a juridical entity separate from the Government. Thus, even if we concluded that ETECSA's property was not immune for one of the reasons discussed in the previous paragraph, we would still have to conduct this inquiry in order to determine ETECSA's liability.

[14]*See Alejandre II,* 42 F.Supp.2d at 1340.

[15]The district court held that the amounts owed ETECSA were both within the United States and used for a commercial activity therein. *See Alejandre II,* 42 F.Supp.2d at 1340-41. We express no opinion on the correctness of this holding.

*de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) [hereinafter *Bancec* ], however, teaches that things are not that simple.[16]

According to *Bancec,* "[t]he language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state." *Id.* at 620, 103 S.Ct. at 2597. Instead, government instrumentalities enjoy a presumption of separate juridical status vis-a-vis the foreign government to which they are related. While *Bancec* applied this presumption for purposes of determining whether an instrumentality could be held substantively liable for the debts of its related foreign government, subsequent decisions have also applied it in determining whether an exception to immunity that applies to the government may be attributed to the instrumentality as well. *See id.* at 613, 103 S.Ct. at 2593 (considering whether Citibank could set off value of branches nationalized by Cuban Government against amount Citibank owed to presumptively separate Cuban instrumentality); *Hercaire,* 821 F.2d at 564-65 (considering whether waiver of immunity by foreign government also operated to deprive presumptively separate instrumentality of immunity).[17] We must consider, therefore, whether this presumption may be overcome in order to make ETECSA's assets the property of a "foreign state" (i.e., the property of the Cuban Government), thus

---

[16]*See also Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines,* 965 F.2d 1375, 1381 (5th Cir.1992) ("Section 1603 defines the universe of entities entitled to statutory sovereign immunity. This is completely different from the question whether a foreign state and its agency or instrumentality are alter egos for purposes of substantive liability." (footnote omitted)).

[17]*See also Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 446 (D.C.Cir.1990) (finding that presumption of juridical separateness of entities also applies to issue of immunity from jurisdiction); *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 175-79 (5th Cir.1989) (considering whether commercial activity by presumptively separate instrumentality could operate to deprive related foreign government of immunity from suit).

In addition, we note that applying this presumption of separate juridical status to instrumentalities at the immunity stage is consistent with the logic of section 1610(a)(7). Unless ETECSA and the Cuban Government are shown to be the same entity, it would make little sense to read section 1610(a)(7) as providing that the U.S. commercial property of *ETECSA* is not immune from garnishment to satisfy a judgment relating to a claim from which the *Cuban Government* was not immune under section 1605(a)(7).

10

rendering the exception to immunity in section 1610(a)(7) applicable to ETECSA and making ETECSA substantively liable for the Government's debt to the plaintiffs. *See Letelier v. Republic of Chile,* 748 F.2d 790, 793 (2d Cir.1984).

In *Bancec,* the Supreme Court highlighted two situations in which a plaintiff may overcome the presumption of separate juridical status enjoyed by an instrumentality. First, when a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, the Court observed that one may be held liable for the actions of the other.[18] Second, the Court recognized the broader equitable principle that the doctrine of corporate entity will not be regarded where to do so would work fraud or injustice or defeat overriding public policies. *See Bancec,* 462 U.S. at 629-630, 103 S.Ct. at 2601-02. In either situation, the plaintiff bears the burden of proving that the instrumentality is not entitled to separate recognition. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 447 (D.C.Cir.1990); *Letelier,* 748 F.2d at 795.[19]

2.

These principles of foreign sovereign immunity provide much of the context necessary for our review of the district court's decision. Given the procedural posture of this case, however, we must also be guided by relevant principles of Florida garnishment law. *See* Fed.R.Civ.P. 69(a); *Buck Creek Indus., Inc. v. Alcon*

---

[18]The principal/agent terminology used by the Court could be read to suggest only that an owner who exercises sufficient control over his corporate agent may be held liable for the agent's actions. As we discuss below, however, liability can also flow in the other direction. *See infra* part II.A.2. For example, the corporate agent may be held responsible for its owner's debts to third parties upon a showing that the owner's exercise of control constitutes an abuse of the corporate form sufficient to deprive the agent of its independent juridical identity. *See Letelier,* 748 F.2d at 795 (placing burden on plaintiff, who sought to execute upon assets of instrumentality in satisfaction of judgment against related foreign government, to show abuse of corporate form of type *Bancec* recognized as sufficient to overcome instrumentality's presumptively separate existence).

[19]While "the presumption of independent status is not to be lightly overcome," *Hercaire,* 821 F.2d at 565, a court deciding whether a plaintiff has carried this burden must also be mindful that the instrumentality and its related government—not the plaintiff—will frequently possess most of the information needed to determine whether the presumption should be overcome. These foreign entities obviously have little incentive to provide information that will help the plaintiff's case, and it may be difficult for the plaintiff to obtain discovery from them.

*Constr., Inc.,* 631 F.2d 75, 76 (5th Cir.1980).[20]

In their replies to the garnishees' answers, the plaintiffs asserted that the amounts owed by the garnishees to ETECSA were subject to garnishment on the ground that any indebtedness owed to ETECSA constituted an indebtedness to the Cuban Government. We interpret this assertion as a claim that ETECSA is an alter ego of the Cuban Government. Under Florida law, when a plaintiff (judgment creditor) seeks to garnish a debt owed to an entity that was not a party to the underlying judgment on the ground that the entity is an alter ego of the judgment debtor, the plaintiff bears the burden of demonstrating the alter ego relationship. *See Live Supply, Inc. v. C&S Plumbing, Inc.,* 402 So.2d 505, 506-07 (Fla. 4th DCA 1981);[21] *Reeves v. Don L. Tullis & Assocs.,* 305 So.2d 813, 815 (Fla. 1st DCA 1975) (placing burden on plaintiff to prove truth of allegation made in reply to garnishee's answer). This burden is consonant with the burden

---

[20]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[21]*Live Supply* requires the plaintiff to make an initial showing regarding the alter ego relationship at an evidentiary hearing on his motion for a writ of garnishment. This requirement is rooted in the procedural due process concerns associated with prejudgment garnishments. *See id.* Although we do not decide this case based upon whether the plaintiffs successfully showed—at an evidentiary hearing *prior to the issuance of the writs*—that ETECSA was an alter ego of the Cuban Government, it seems that they did not do so.

In *Live Supply,* the trial court issued writs of garnishment *ex parte* based upon the plaintiff's representation in its unsworn motion that an alter ego relationship existed between the judgment debtor and another entity named in the motion; no evidentiary hearing was held regarding this representation. On appeal, the *Live Supply* court said that all the entity need do to obtain dissolution of the writs was "to alert the court by motion of the impropriety of the writ because of the independent identity of the entity." *Id.; see also ABC Sewer Cleaning Co. v. Foxco, Inc.,* Civ. A. No. 90-1934 (E.D.Pa. Sept. 21, 1990); *Strick Corp. v. Thai Teak Prods. Ltd.,* 493 F.Supp. 1210, 1215-17 (E.D.Pa.1980). In this case, by comparison, the plaintiffs filed an unverified motion for writs of garnishment pursuant to Fla. Stat. ch. 77.03. This motion requested that writs be issued to several garnishees asking them to serve an answer stating, *inter alia,* whether they were indebted to "the Defendants, the Republic of Cuba and the Cuban Air Force." ETECSA was not mentioned by name in the motion. After the district court granted the motion (apparently without a hearing) but before the writs were issued by the clerk, the plaintiffs incorporated additional language into the writs which asked the garnishees whether they were indebted to any "agencies, entities, or instrumentalities" of the Cuban Government. *See supra* note 3. Again, ETECSA was not mentioned by name. The plaintiffs' first assertion that ETECSA itself could be held responsible for the Cuban Government's debts came in their replies to the garnishee's answers—well after the issuance of the writs. From a procedural due process perspective, this series of events seems even more troubling than the events in *Live Supply.*

12

faced by a plaintiff who seeks to overcome an instrumentality's presumptively separate juridical status on the ground that the first situation mentioned by the *Bancec* Court applies. *See supra* note 18.

In order to determine whether the plaintiffs carried their burden in this case, we must assess their arguments from the perspective of the Cuban Government. Florida law provides that when a plaintiff holding a judgment serves a writ of garnishment upon a garnishee, the plaintiff steps into the shoes of the judgment debtor and can assert only the rights that the judgment debtor could have asserted against the garnishee. *See Hughes Supply, Inc. v. A.C. Elec. Corp.,* 145 F.R.D. 590, 593 (M.D.Fla.1993); *Reeves,* 305 So.2d at 815-16. Thus, if a contractual debtor-creditor relationship between the garnishee and the judgment debtor is terminated by a non-fraudulent novation that obligates the garnishee to a third party and eliminates the judgment debtor as a party to the contract, the plaintiff has no right to garnish sums owed by the garnishee to the third party. *See id.* at 816.

B.

1.

With these principles in mind, we consider the district court's decision to hold ETECSA responsible for the Cuban Government's debt to the plaintiffs. The court disregarded the presumptively separate juridical status of ETECSA by invoking the second situation mentioned in *Bancec*: that the corporate entity will not be regarded where to do so would work fraud or injustice or defeat overriding public policies. The court did not rely upon the fraud element of this rule, and indeed there appears to be no evidence in the record that would support a finding of fraud. For example, the plaintiffs made no showing that the apparent novation that transferred the rights and obligations of EMTELCUBA (an alter ego responsible for the debts of the Cuban Government, *see supra* note 7) under the Operating Agreements to ETECSA was entered into for the purpose of insulating payments made under those Agreements from garnishment by the Cuban Government's creditors. Instead, the court rested its decision on concerns about injustice and public policy. The core of the court's legal rationale was that failing to disregard ETECSA's separate status "not only would prevent [the plaintiffs] from collecting their court-ordered final judgment for the victims of a grave violation of

13

international law, but also would override the clear legislative policy against such terrorist attacks and in favor of broadening the property which may be executed [upon] to compensate for them." *Alejandre II,* 42 F.Supp.2d at 1339. In particular, the court concluded that 28 U.S.C. § 1610(f)(1)(A) constituted an "express[ ] legislative commitment to subject the property of a government instrumentality to attachment or execution to satisfy a judgment against [a] terrorist foreign state." *Id.*

Upon reviewing this rationale *de novo,* we conclude that it is not a sufficient basis for overcoming the presumption of separate juridical status that ETECSA enjoys. While the district court's concern about the injustice of preventing plaintiffs from collecting their judgment is understandable,[22] this concern is present in every case in which a plaintiff seeks to hold an instrumentality responsible for the debts of its related government. Allowing the *Bancec* presumption of separate juridical status to be so easily overcome would effectively render it a nullity. We recognize that the district court made an effort to distinguish this case based upon the gravity of the underlying violation of international law. Given the absence of any evidence that ETECSA was involved in the violation, however, we fail to see how this distinction is relevant to the question of whether ETECSA's separate juridical status should be overcome.

With regard to the district court's public policy concerns, we agree that recent enactments evince a congressional policy against terrorist attacks and in favor of making additional property of governments that sponsor terrorism (such as Cuba) available to compensate victims of such attacks. We disagree, however, with the district court's conclusion that Congress—in section 1610(f)(1)(A)—took the further step of overriding the *Bancec* presumption of separate juridical status by making instrumentalities responsible for

---

[22]We note, however, that the injustice identified by the district court is not the type of injustice that concerned the *Bancec* Court. *See Bancec,* 462 U.S. at 632-34, 103 S.Ct. at 2603 (disregarding instrumentality's separate juridical status based on equitable principles in order to "avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law"). In addition, the district court gave no weight to the countervailing injustice that a decision to disregard ETECSA's separate status could impose upon ETECSA's non-Cuban minority shareholders.

14

the debts of their related terrorist-sponsoring governments.[23]  Section 1610(f)(1)(A) provides:

> Notwithstanding any other provision of law, ... any property with respect to which financial transactions are prohibited or regulated pursuant to [certain statutes, including those authorizing the CACR,[24]] ... [or any] license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7).

The effect of this section is not to subject property claimed by the instrumentality ETECSA to execution in order to satisfy the plaintiffs' judgment against the Cuban Government, but to allow the plaintiffs to execute upon property claimed by the Government itself in order to satisfy their judgment (which relates to a claim from which the Government was not immune by virtue of section 1605(a)(7)) without first obtaining a license under the CACR. *See* 31 C.F.R. § 515.203(e).  Congress has previously demonstrated in the FSIA context that it knows how to express clearly an intent to make instrumentalities substantively liable for the debts of their related foreign governments.[25]  Absent such a clear expression, which does not appear in section

---

[23]In evaluating this conclusion, it is important to keep in mind that the *Bancec* presumption of separate juridical status applies for purposes of determining both whether an instrumentality can be held responsible for the debts of its related foreign government and whether the instrumentality retains its immunity from execution. *See supra* part II.A.1.  Thus, even if we agreed with the district court's conclusion that section 1610(f)(1)(A) makes ETECSA liable for the Cuban Government's debt to the plaintiffs, we would also have to conclude that it deprives ETECSA of its immunity from execution in order to allow the plaintiffs to garnish amounts owed ETECSA.  It is unclear whether section 1610(f)(1)(A) could be viewed as having this effect.  On the one hand, the difference between the operative language of section 1610(a)(7) (property "shall not be immune from" execution) and section 1610(f)(1)(A) (property "shall be subject to" execution) suggests that these two provisions work together:  the former provision renders a foreign state's U.S. commercial assets non-immune from garnishment to satisfy a judgment relating to a claim from which that state was not immune under section 1605(a)(7);  the latter then removes the CACR license requirement for a plaintiff who seeks to garnish non-immune assets to satisfy a judgment that relates to such a claim.  Under this interpretation, section 1610(f)(1)(A) does not have any effect upon the immunity of the state.  On the other hand, the statement in section 1610(f)(1)(A) that certain state assets shall be subject to execution "[n]otwithstanding any other provision of law" could be read as both an exception to the state's immunity from execution and an exception to the CACR license requirement.  Both interpretations seem plausible, but it is not necessary for us to choose between them here.

[24]For a discussion of changes in the statutory provisions authorizing the CACR, see *Regan v. Wald,* 468 U.S. 222, 225-30, 104 S.Ct. 3026, 3029-31, 82 L.Ed.2d 171 (1984).

[25]In 1988, a bill was introduced in the House of Representatives that would have amended 28 U.S.C. § 1610(a) to deprive a foreign state's U.S. property of immunity from execution if "the property belongs to an *agency or instrumentality* of a foreign state engaged in a commercial activity in the United States and the judgment relates to a claim for which the *foreign state* is not immune from jurisdiction by virtue of section

15

1610(f)(1)(A),[26] we see no reason to interpret that section as contravening Congress' original understanding that the FSIA "[is] not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state." *Bancec,* 462 U.S. at 620, 103 S.Ct. at 2597.

2.

Having concluded that the district court erroneously disregarded ETECSA's separate juridical status on the ground that the second situation mentioned in *Bancec* applied, we turn to the question of whether the plaintiffs may instead overcome ETECSA's separate status under the first *Bancec* situation—that is, whether the plaintiffs carried their burden under Florida law of proving the alter ego relationship between the Cuban Government and ETECSA. After considering the affidavits submitted by the parties, the district court held that the plaintiffs had not carried their burden. *See Alejandre II,* 42 F.Supp.2d at 1339 ("Although their relationship may bear some similarities to that between a principal and an agent, the Court does not conclude that the relationship between the Government of Cuba and ETECSA is so similar that the [*Bancec* ] presumption of independent juridical status is overcome."). We agree. Indeed, when the situation is viewed from the perspective of the Cuban Government (in whose shoes the plaintiffs stand), it would be difficult to come to any other conclusion.

Suppose, for example, that the Cuban Government sued AT&T Corp. on the ground that AT&T had failed to pay it (through EMTELCUBA, its alter ego) certain sums that allegedly became due under the

---

1605 or 1607." H.R. Res. 3763, 100th Cong. § 3(1)(D), 134 Cong. Rec. H6484-01 (1988) (emphasis added). This bill was never enacted.

[26]The reference in this section to "a foreign state (including any agency or instrumentality of such state) claiming such property" merely indicates that the regulated property claimed by an agency or instrumentality of state X is subject to execution upon a judgment relating to a claim from which *that agency or instrumentality* was not immune under section 1605(a)(7). In our view, this reference cannot plausibly be interpreted to mean that regulated property claimed by an instrumentality of state X—and thus not by the government of state X or some other instrumentality thereof—is subject to execution upon a judgment relating to a claim from which the government of state X (or its other instrumentality) was not immune under section 1605(a)(7).

Operating Agreement in 1996. AT&T surely would defend on the ground that while it would have owed such sums to the Government had they become due in 1994, the Government no longer had any right to the sums because ETECSA succeeded to EMTELCUBA's rights and obligations under the Operating Agreement in early 1995. In order to prevail, then, the Government would have the burden of convincing the court to swallow the argument that the substitution of ETECSA for EMTELCUBA under the Agreement had been a purposeless and ineffectual act by which the Government merely changed its name to "ETECSA" while remaining the real party in interest. The plaintiffs face exactly the same burden in this case, and we find that this argument is too difficult to digest.

Nevertheless, the plaintiffs contend that we must conclude, as a matter of law, that ETECSA is an alter ego of the Cuban Government because ETECSA receives payments from the carriers under the OFAC licenses.[27] In support of this contention, the plaintiffs point out that the relevant statute authorizes the President to "provide for the issuance of licenses for the full or partial payment to Cuba of amounts due Cuba as a result of the provision of telecommunications services." 22 U.S.C. § 6004(e)(3)(A). Not surprisingly, the sections of the CACR that implement this statute and the licenses issued by OFAC thereunder include similar language. *See* 31 C.F.R. §§ 515.418(a), 515.542(c). The plaintiffs argue that these references to "Cuba" mean that the licenses do not permit the carriers to make payments to any entity other than the Cuban Government.[28] By making and accepting payments under these licenses, therefore, the carriers and ETECSA are supposedly estopped to deny that ETECSA is an alter ego of the Government.

We reject this argument for two reasons. First, while the term "Cuba" is not specifically defined in

---

[27]The plaintiffs made a similar argument to the district court. The district court rejected it. *See Alejandre II,* 42 F.Supp.2d at 1334-36.

[28]The plaintiffs also note that the President has consistently reported to Congress, on a semi-annual basis, that the payments made by the carriers under the OFAC licenses are made to the "Government of Cuba." *See, e.g.,* 144 Cong. Rec. H10343-02 (Oct. 9, 1998). While such reports are required by the statute that authorized the issuance of the licenses, *see* 22 U.S.C.A. § 6004(e)(6) (West Supp.1999), there is no evidence that they have any legal effect at all, much less the effect of prohibiting payment to an entity (such as ETECSA) that is not mentioned in the reports but is authorized to receive payment under the terms of the licenses themselves.

the statute, the CACR define it to include "any political subdivision, agency, or instrumentality thereof." 31 C.F.R. § 515.301 (1998) (defining "foreign country"); *see also* 31 C.F.R. § 515.201(d) (1998) (stating that the term "designated foreign country" means Cuba).  Thus, the garnishees' payments to "Cuba" under the licenses could be lawfully made to the separate instrumentality ETECSA rather than to the Cuban Government itself.  In addition, we note that the licenses issued to all of the carriers authorize more than merely payments to "Cuba";  they also authorize all necessary transactions incident to the performance of the Operating Agreements that the carriers negotiated with EMTELCUBA.[29]  Because these Agreements provide that the expression "EMTELCUBA" includes that entity's successors, all necessary transactions with its successor ETECSA are apparently authorized as well.

### C.

Finally, the plaintiffs contend on appeal that even if we reject their legal arguments that ETECSA is not a juridical entity separate from the Cuban Government, we must remand this case for discovery regarding the actual relationship between ETECSA and the Government.  The plaintiffs argue that such discovery, which they never had an opportunity to seek below, is necessary if they must attempt to prove an alter ego relationship between ETECSA and the Government.  We recognize that courts of appeals have not been hesitant to remand for further factual inquiry in an FSIA case after clarifying the legal standards that govern the case. *See, e.g., Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines,* 965 F.2d 1375, 1383 (5th Cir.1992);  *Foremost-McKesson,* 905 F.2d at 448, *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1029-30 (D.C.Cir.1982).  Nevertheless, we conclude that the plaintiffs expressly waived any right to discovery upon remand in this case.

On February 12, 1999, only four days before the district court was scheduled to hold a hearing on the carriers' motion to dissolve the writs of garnishment, the plaintiffs filed a motion to postpone the hearing for nine weeks and to set an expedited schedule for discovery regarding the issues raised by the writs.  The

---

[29]As discussed in note 9, *supra,* the licenses issued to TLD and AT&T of Puerto Rico authorize transactions incident to those carriers' agreements with ETECSA itself.

carriers opposed this motion on the ground that a nine-week delay in payment of funds to ETECSA could lead to disruption of telecommunications services between the United States and Cuba. At the hearing on February 16, the plaintiffs told the court that they were prepared to go forward and address all of the issues before it. They also stated, however, that they did not "want to withdraw the motion ..., only because we may want to supplement the record." Later in the hearing, the plaintiffs clarified that "[a]ll we are saying to the court [is that] after the court rules, ... [i]t may be appropriate to supplement the record with certain documents which support the court's ruling and may not even be necessary." The court's response indicated that it construed these statements to mean that the plaintiffs were withdrawing their motion for discovery[30] and moving instead to supplement the record. The court therefore stated that "[y]our motion to supplement the record, if it should be necessary or required, is granted." Following the hearing, the plaintiffs did supplement the record by filing a compilation of materials (including affidavits) with the court.

We agree with the district court's conclusion that the plaintiffs withdrew their motion for discovery. Therefore, the plaintiffs have waived any right to discovery on remand.

III.

For the foregoing reasons, we VACATE the judgment of the district court and REMAND this case with instructions to dissolve the plaintiffs' writs of garnishment insofar as they seek to garnish amounts owed to ETECSA.

IT IS SO ORDERED.

---

[30]In a subsequent order, the court formally denied as moot the plaintiffs' motion to postpone the hearing and set an expedited discovery schedule.